UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHARLES BROOKS,                                                    LEAD CASE

                                        Plaintiff,                 9:15-CV-00090 (BKS/TWD)

v.

MICHAEL HOGAN, et al.,

                                        Defendants.
_____

CHARLES BROOKS,                                                    MEMBER CASE

                                        Plaintiff,                 9:17-CV-00585

v.

ANN MARIE T. SULLIVAN, et al.,

                                        Defendants.
_____

APPEARANCES:                                                       OF COUNSEL:

CHARLES BROOKS
Plaintiff, *pro se*

HON. LETITIA JAMES                                                 WILLIAM E. ARNOLD, IV, ESQ.
Attorney General for the State of New York                        Assistant Attorney General
Counsel for Defendants[1]

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        This consolidated civil rights action, brought by *pro se* Plaintiff Charles Brooks

("Plaintiff" or "Brooks") under 42 U.S.C. § 1983, has been referred for a report-recommendation

---

[1]  The Attorney General for the State of New York represents all Defendants except for Dr.
Kumar Bahl, who has not been served.  (*See generally* Docket Report.)

by the Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. 636(b) and Local Rule 72.3.

Plaintiff is involuntarily civilly confined at the Central New York Psychiatric Center ("CNYPC") in the Sex Offender Treatment Program ("SOTP") under the custody of the New York State Office of Mental Health ("OMH") pursuant to Article 10 of the New York State Mental Hygiene Law ("MHL"). (*See generally* Dkt. No. 158,[2] Dkt. No. 199-1 at ¶ 1.) In the consolidated complaint, the operative pleading, Plaintiff asserts numerous claims for relief arising out of the conditions of his confinement, including that certain treatment modalities are punitive in nature, the lack of proper and/or adequate mental health treatment, the denial of adequate clothing, having no access to a law library or legal resources, and retaliation. (Dkt. No. 159.)

Remaining Defendants, former and current employees of OMH and CNYPC, are: Michael Hogan, Richard P. Miraglia, Jeffrey Nowicki, Donald Sawyer, Terri Maxymillian, Anthony Gonzalez, Dr. Kumar Bahl, Dr. Shannon Forshee, Dr. Vera Solovieva, Dr. Sergey Golovko, Dr. Edwin DeBroize, Charmaine Bill, Mark Cebula, Lucy Dawes, Emily Gray, Kyle Velte, Sandra Tedesco, Ann Marie T. Sullivan, Donna Hall, Christopher Kunkle, Deborah McCulloch, Dr. Elizabeth Farnum, Christopher Mayer, Erica Saxson, Kim Sokernyk, Mallory Coveleski, Katie LaRock, Danielle Hermann, Tarita Mills, Michael Patterson, and Michael Larkin. (Dkt. Nos. 158, 161, 196-4, 196-5.[3])

---

[2] Unless otherwise identified, docket references are to the Lead Case, No. 9:15-CV-00090.
[3] The work histories for each individual Defendant during the relevant time periods is set forth in the affidavits of non-parties Mandigo and Mahar. (Dkt. Nos. 196-4, 196-5.) For ease of reference, a table summarizing Defendants' employment history is also set forth in the Declaration of AAG Arnold ("Arnold Declaration"). (Dkt. No. 196-3.) The Court notes precise spelling of the names of some of the Defendants differs from that set forth in the consolidated complaint. (*Compare* Dkt. No. 159 *with* Dkt. Nos. 196-4, 196-5, 199-2.) The spelling utilized

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 196.)  Plaintiff did not respond to the motion for summary judgment despite several extensions of time to do so.  (Dkt. Nos. 202, 205, 209.)  Therefore, the Court considers the motion unopposed.  (Dkt. No. 213.)  For reasons explained below, the Court recommends granting Defendants' motion and dismissing the consolidated complaint in its entirety with prejudice.

## I.    BACKGROUND

### A.    Relevant Procedural History[4]

On January 26, 2015, Plaintiff commenced the Lead Case in this action, which was opened as case number 9:15-CV-0090 (BKS/TWD) ("Brooks I").  (Dkt. No. 1.)  The following claims set forth in the second amended complaint survived the District Court's initial review: (1) Plaintiff's Fourteenth Amendment due process claims against Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco regarding Plaintiff's placement in the Motivation on Deck ("MOD") Unit beginning in 2008; (2) Plaintiff's Fourteenth Amendment claims that Defendants Bosco, Nowicki, Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco denied Plaintiff adequate mental health care; (3) Plaintiff's First Amendment denial of access to the courts claims against Defendants Hogan, Miraglia, Bosco, and Nowicki; and (4) Plaintiff's Fourteenth Amendment conditions of confinement claims

_____

by Defendants Dr. Shannon Forshee, Dr. Vera Solovieva, Dr. Edwin DeBroize, Emily Gray, and Tarita Mills will be adopted here.  (*See* Dkt. No. 196-4 at ¶¶ 8, 9, 11, 15, 27.)

[4]  For further discussion of the procedural history of this consolidated action, historical background regarding the relevant provisions of the MHL, and Plaintiff's litigation history, reference is made to the District Court's prior decisions.  (*See, e.g.*, Dkt. Nos. 9, 34, 71, 158.) *See also Brooks v. Spitzer*, No. 9:13-CV-1483 (GLS/ATB), at Dkt. Nos. 45, 50 (discussing Plaintiff's criminal background, litigation history, and the evolution of the MHL).

regarding the punitive nature of his confinement against Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco. (Dkt. Nos. 33, 4, 71.) Defendants, except for Bahl,[5] answered the second amended complaint. (Dkt. Nos. 52, 55, 83.)

On May 25, 2017, Plaintiff commenced the Member Case in this action, opened as case number 9:17-CV-0585 (LEK/TWD) ("Brooks II"), against twenty-eight individuals, many of whom are also Defendants in Brooks I. (Brooks II, Dkt. No. 1.) By Decision and Order entered September 29, 2017, Senior United States District Judge Lawrence E. Kahn ordered Plaintiff's First Amendment retaliation and Fourteenth Amendment due process claims regarding his restrictive confinement, lack of adequate mental health treatment, and denial of adequate clothing survived initial review and required a response from Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan. (Brooks II, Dkt. No. 4.)

By Decision and Order entered February 26, 2018, the District Court consolidated Brooks I and Brooks II. (Dkt. No. 158.) The consolidated complaint, filed in accord with the consolidation order, is 133 pages long. (Dkt. No. 159.[6]) Defendants, except for Bahl, filed their answer to the consolidated complaint on March 1, 2018, and moved for summary judgment on

---

[5] According to the Docket Report, the Marshals attempted service twice, but were unable to serve the second amended complaint on Bahl. (Dkt. Nos. 58, 65; *see also* Dkt. No. 67, 73.) The record evidence demonstrates Defendant Bahl, a psychiatrist, resigned from CNYPC SOTP on July 6, 2012. (Dkt. No. 196-4 at ¶ 17.)

[6] Pursuant to the consolidation order, the complaint in Brooks II was attached to the second amended complaint in Brooks I, which together constitutes the consolidated complaint. (Dkt. Nos. 158, 159.) Defendants refer to Plaintiff's remaining claims as alleged in Brooks I and Brooks II. (*See* Dkt. No. 199-2.) For ease of reference, the Court does the same.

March 15, 2019.  (Dkt. Nos. 161, 196, 199-2.[7])  Despite being warned of the consequences of

failing to properly respond to the motion for summary judgment, and the Court extending

Plaintiff's time to file a response three times, Plaintiff did not oppose the motion for summary

judgment.  (Dkt. Nos. 196-45, 197, 202, 205, 209, 213.)

    **B.**    **Plaintiff's Consolidated Complaint[8]**

        **1.**    **Placement in the MOD Unit in 2008**

In Brooks I, Plaintiff describes the MOD Unit as a "self-contained residential and

treatment floor for residents who have 'engaged in violence, threats of violence, or other chronic

treatment interfering behaviors[.]'"  (Dkt. No. 159 at 27.[9])  Plaintiff was transferred to the MOD

Unit on October 18, 2008, and was kept there for two years.  *Id*. at 27, 29, 34, 37.  Plaintiff

claims he was placed in the MOD Unit for punitive reasons and without justification because he

did not have a history of violent behavior and his "first act of aggression did not occur until the

date of July 27, 2010," "when he physically assaulted" another resident "by slapping him across

---

[7]  The Court notes Bahl's name was included in Defendants' answer to the consolidated complaint.  (*See* Dkt. No. 161 at ¶ 30.)  However, as noted above, Bahl was never served with the second amended complaint in Brooks I.  (Dkt. Nos. 58, 65, 67, 73.)  The Court further notes the Office of Attorney General has never entered a notice of appearance on behalf of Bahl.  (*See generally* Docket Report; *see also* Dkt. No. 73 (status report filed by AAG Mulvey advising that per OMH, Bahl had relocated to Virginia and had no further information concerning his address); 03/02/2017 Text Minute Entry for telephone status conference (AAG Mulvey appearing for all Defendants excepted Bahl); Dkt. No. 189 (Notice of Appearance filed by AAG Arnold on behalf of all Defendants except Bahl).)  Moreover, the pending motion is submitted on behalf of all Defendants except Bahl.  (*See* Dkt. Nos. 196, 196-3, 199-2.)  Accordingly, the Court presumes the inclusion of Bahl's name in response to the consolidated complaint and any subsequent submissions to the Court was due to clerical error.

[8]  The Court treats the verified consolidated complaint (Dkt. No. 159) as an affidavit for purposes of the present motion and considers the relevant factual allegations therein to the extent they are nonconclusory.  *See Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 210 (N.D.N.Y. 2008) (citations omitted).

[9]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

the face." *Id*. at 29, 33-34, 39-40, 43.[10] Plaintiff alleges his placement in the MOD Unit was "maliciously motivated." *Id*. at 35. According to Plaintiff, he was not afforded "appropriately applicable due process protections, in the form of 'an opportunity to receive notice of any infraction(s),' 'an opportunity to defend against what would have been used against him,' 'and to be afforded a hearing'" prior to his placement in the MOD Unit. *Id*. at 43.

### 2. Punitive Confinement

In Brooks I and Brooks II, Plaintiff alleges the conditions of his confinement are punitive in nature. *Id*. at 25-53, 76-133. On initial review of the second amended complaint in Brooks I, the District Court found Plaintiff's allegations that Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco subjected him to unsafe conditions of confinement when they placed him in the MOD Unit in violation of the Fourteenth Amendment failed to state a claim. (Dkt. No. 34 at 10-13, 19.) However, in his motion for reconsideration, Plaintiff argued, *inter alia*, his Fourteenth Amendment conditions of confinement claims against these Defendants should have been allowed to proceed. (Dkt. No. 62 at 6-12.) Plaintiff pointed to several allegations in his second amended complaint to demonstrate that his conditions of confinement claims were intended to go beyond what the District Court originally construed as a claim and referenced several exhibits, which, according to Plaintiff, "further corroborated his conditions of confinement claims," including Plaintiff's Exhibits marked A, A1, A2, A3, B2, D, D1, D2 , D3, and I. *Id*. at 6.[11] Plaintiff's Exhibit A2 references "punishments" on June 20, 2011, May 8, 2014, October 15,

---

[10] Plaintiff also engaged in "physical aggression" on September 8, 2010, and January 8, 2012, by physically assaulting another resident and staff member, respectively. (Dkt. No. 159 at 41.)
[11] These exhibits were docketed as a submission in support of Plaintiff's second amended complaint in Brooks I. (Dkt. No. 35; *see also* Dkt. Nos. 32, 34 at 20.)

2014, and January 20, 2015. (Dkt. No. 35 at 8-12.) Plaintiff also claims he was subjected to "punishment rather than treatment" and was placed on MOD status with loss of privileges on April 28, 2014, November 16, 2014, January 26, 2015, and April 1, 2015, for "exhibitionistic conduct." *Id*. at 13-17.

Construing the second amended complaint in Brooks I in this light, the District Court reinstated the conditions of confinement claims against Defendant Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco, based on Plaintiff's elaborated claim that his conditions of confinement, although disguised as treatment, are actually punitive in nature and, therefore, violate his substantive due process rights. (Dkt. No. 71.)

Similarly, in Brooks II, Plaintiff claims he was subjected to punitive and restrictive conditions of confinement by Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan. (Dkt. No. 159 at 76-133.) Plaintiff identifies several instances in which he was allegedly subjected to restrictive conditions and/or placed in the MOD Unit in violation of the Fourteenth Amendment.

On May 10, 2015, Plaintiff was confined to his dorm room after having been assaulted by another CNYPC resident. *Id*. at 95. The following day, Plaintiff was placed in the MOD Unit and urged to complete a Behavior Chain Analysis ("BCA") and "conced[e] to not just having physically assaulted" another resident, "but also to having a patterned-history of physically assaultive behavior." *Id*. at 96. Defendants knew that Plaintiff was not the aggressor in the incident and confined him in the MOD Unit to punish him for his "masterbatory [sic] behavior observed by staff over the past week." *Id*. at 97-98, 103. Plaintiff remained in the MOD Unit

until May 15, 2015, and was thereafter subject to twenty-eight days of MOD status. *Id*. at 99, 105.

On October 2, 2016, following a physical altercation with another resident, Plaintiff was placed on "1:1 visual constant observation" at the direction of Defendant Farnum. *Id*. at 108. The order was to remain in place until the following day at 1:00 PM. *Id*. However, at approximately 5:15 PM on October 3, 2016, Defendant Solovieva prolonged the constant observation status and ordered Plaintiff be transferred to the MOD Unit, where his movements and activities were restricted. *Id*. Following a visit from the treatment team on October 5, 2016, Plaintiff's confinement in the MOD Unit was continued in retaliation for his complaints and prior litigation. *Id*. at 113. Plaintiff spent eighteen days wrongfully confined in the MOD Unit, from October 3 to October 18, 2016. *Id*. at 108-15. When released on October 18, 2016, Plaintiff was "still the subject of the inherited twenty-eight day MOD-status." *Id*. at 115. Additionally, Plaintiff contends he does not display violent tendencies and the MOD Unit is "not appropriate" for his sexual disorder. *Id*. at 118.

### 3. Mental Health Treatment

Generally, in Brooks I and Brooks II, Plaintiff claims he has been denied appropriate or adequate mental health treatment in violation of his Fourteenth Amendment rights throughout his confinement at CNYPC SOTP by Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, Tedesco, Coveleski, Dawes, Farnum, Hermann, LaRock, Larkin, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Hall, Kunkle, McCulloch, and Sullivan. *Id*. at 26-53, 77-125. According to Plaintiff, the MOD Unit only "administers treatment to address 'aggression' and not sex offender treatment." *Id*. at 31.

Additionally, Plaintiff claims he was not afforded "individualized treatment" at CNYPC for his exhibitionism and has instead been punished for behaviors related to his diagnosis. *Id*. at 34, 97.

Specifically, in Brooks I, Plaintiff claims he was placed in the MOD Unit on October 18, 2008, because "[i]t was . . . the hope of the treatment team[] that [he] would abandon his repetitive requests to be afforded 'meaningful' treatment to address his diagnos[ed] Exhibitionism." *Id*. at 28, 34. Additionally, Plaintiff alleges it is his "strongest belief" that "the reason the treatment team remained consistent in their effort to disregard his requests concerning appropriately applicable treatment [was] [b]ecause of the unavailability of any professional possessing the 'specific' training in the field of exhibitionism." *Id.* at p. 28. He contends the MOD Unit only "administers treatment to address 'aggression,' and not sex offender treatment." *Id*. at 31.

On November 9, 2010, Plaintiff was transferred from the MOD Unit to a "Phase I unit/ward" on "the MAPPS Trac." *Id*. at 34, 52. While in the "Phase 1 unit/ward" he "continued to be denied individualized treatment, or for that matter 'meaningful treatment,' due to the fact that 'ONLY' phases 2-4 are permitted to address sexual offending behavioral issues." *Id.* at 34. Despite his many requests to receive treatment for exhibitionism, Plaintiff "has yet to receive the meaningful treatment." *Id*. at 36. Plaintiff similarly alleges that he "put forth" a "vigorous effort" "to remain receptive to treatment, while also alerting even physician's [sic] from out-side [sic] of CNYPC, to the fact that he Brooks, was not receiving 'meaningful' treatment, due to the unavailability of a physician either trained, or available here at CNYPC, that possess[es] adequate knowledge concerning exhibitionism." *Id*. at 48. According to Plaintiff, "the treatment team" made it known to him that "CNYPC's curriculum 'only' provides treatment to address

sexual violence" and that he "should adhere to the facilities [sic] curriculum rather than seeking individualized treatment." *Id*.

Additionally, Plaintiff states he was kept in the "the MAPPS Trac" from November 9, 2010, until March 31, 2011, which predominantly focuses on administering treatment geared to address Psychopathic pattern of behavior." *Id*. at 52. Plaintiff avers this placement "is yet another clear and convincing example of having been deprived of individualized treatment repeatedly requested by Brooks." *Id*.

In response to the alleged lack of appropriate treatment, Plaintiff claims that he "on many occasions entertained conversations with Defendant Maxymillian concerning being afforded specific individualized treatment to address exhibitionism." *Id*. at 50. Defendant Maxymillian allegedly responded that, "in order to receive treatment for such an issue, there must be evidence demonstrating the existence of an uncontrollable urge." *Id*. Plaintiff felt "extreme agitation and a feeling of hopelessness[.]" *Id*.

By letter dated May 10, 2012, Plaintiff contacted Defendant Bosco "for the purpose of receiving her assistance with, either receiving the requested individualized treatment to address exhibitionism, or to afford him to meet with members of the team for the purpose of providing documents that demonstrate a non[-]existent history concerning sexual violence." *Id*. Because he did not receive a response from Defendant Bosco, Plaintiff sent a second letter dated May 18, 2012, but again did not receive a response. *Id*.

Thus, Plaintiff construed Defendant Maxymillian's previous response "as a bit of advise [sic]" and "felt compelled to revert to openly displaying masterbatory [sic] behavior, for the sole purpose of showing there was an unavailability of any trained psychologist, or psychiatrist in the field of exhibitionism capable of administering meaningful treatment." *Id*.

Plaintiff claims he approached Defendant Bill "for the purpose of posing relevant questions concerning [Plaintiff] having been compelled to endure various methods of discrimination " but was "met with a litany of blatent [sic] disrespect, and a vast amount of an open display of disconcern [sic] for [Plaintiff's] concerns, which prompted him to file a (5) five page complaint dated August 7, 2014 . . . and addressed said complaint to CNYPC's Director of Nursing named Lisa Helmer," who is not a party to this action. *Id.* at 51. In response, Defendant Nowicki sent a "(1) one-page decision dated August 25, 2014 denying [Plaintiff's] claims." *Id.* Plaintiff then submitted a thirty-eight page response to Defendant Nowicki's decision, which "demonstrated how [Plaintiff] remained both consistent and continuous in his efforts to be receptive to the inapplicable treatment being administered here at CNYPC[.]" *Id.* at 52. Plaintiff's response also contradicted Defendant Nowicki's conclusion that Plaintiff was resistant to "fully engage in treatment[.]" *Id.*

In Brooks II, Plaintiff also claims that he was not afforded "individualized treatment" at CNYPC for his exhibitionism and has instead been punished for behaviors related to his diagnosis. *Id.* at 77. For example, on October 26, 2016, Plaintiff was in his dorm room and covered his dorm room door with a towel so that he could "remain appropriate by not openly displaying inappropriate behaviors[.]" *Id.* at 106. However, CNYPC staff directed Plaintiff to remove the towel from his dorm room door and, after the third such demand, Plaintiff "reluctantly removed the towel." *Id.* Plaintiff was "still in the nude and still in the act of masterbatory [sic] behavior, and now, unable to either be appropriate or have appropriateness for any staff." *Id.* As a result of this incident, Plaintiff alleges he received a "verbal tongue lashing" from a CNYPC staff member as well as "additional methods known to be punitive in nature in

the form of (14) fourteen days extension of MOD-status, and suspension from vocational employment for fourteen days." *Id*.

Additionally, Plaintiff claims there is "'**NO**' type of treatment, let alone 'Individualized' 'meaningful' treatment afforded, or administered while a resident on MOD-Untit-504," including "no groups clinical or pro-social groups" when "a resident of the MOD Unit." *Id*. at 97 (emphasis in original). Plaintiff filed administrative complaints regarding his "unwarranted punishments" and the denial of proper and adequate mental health treatment, to no avail. *Id*. at 98, 100, 106-07, 117, 125.

### 4.    Clothing

In Brooks II, Plaintiff claims Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan denied him adequate clothing in violation of the Fourteenth Amendment. *Id*. at 78.

According to Plaintiff, he was provided with free clothing upon his arrival at CNYPC in 2008 and in 2010 following a surgical procedural. (Brooks II, Dkt. No. 29-1 at 2.) Aside from these two occasions, Plaintiff has been required to purchase clothing, such as socks, underwear, and t-shirts, at CNYPC, which had previously been provided to him at no cost by the New York State Department of Corrections and Community Supervision and the Manhattan Psychiatric Center. *Id*. Plaintiff claims he formally requested new clothes, but his requests were denied and/or unanswered. *Id*. at 2-5. Defendant Dawes told Plaintiff that he must purchase the requested items using his monthly Personal Needs Allowance ("PNA"). *See id*. at 5. Plaintiff receives a monthly PNA in the amount of $35.00, which, is insufficient to meet his clothing needs due to other necessary expenses, such as telephone calls, postage, stationary, and

typewriter ribbons. *Id*. at 4. Additionally, Plaintiff's efforts to participate in a "clothing exchange" were unsuccessful. *Id*. at 6-7.

### 5. Access to Courts

In Brooks I, Plaintiff asserts a denial of access to courts claims against Defendants Hogan, Miraglia, Bosco, and Nowicki. (Dkt. No. 159 at 71-72.) Plaintiff states he "remains at a huge disadvantage, without the finances, and without the unavailability[sic] of law books and a law library." *Id*. at 71. Specifically, Plaintiff alleges that, after being unsuccessful in (1) bringing a Writ of habeas corpus identified under Index No. CA2011-001873 (RJI No. 32-11-0646), (2) litigating a § 440.10/440.20 motion identified under Indictment Nos. 6985/1997 and 3757/1998, (3) litigating an Article § 78 identified under Index No. CA2011-001154 (RJI No. 32-11-0530), and (4) litigating a federal habeas corpus action identified as *Brooks v. Sawyer*, No. 9:11-CV-248, "further litigation could not be taken due to the unavailability of law books and a law library, or counsel." *Id*. at 71-72.

### 6. Retaliation

Generally, in Brooks II, Plaintiff alleges Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan are subjecting him to the above alleged unlawful and punitive confinement in retaliation for his ongoing demands for individualized treatment, the numerous complaints filed as early as May 2015, detailing his "Objection to Care and Treatment," and his prior and pending litigation, specifically Brooks I. *E.g. id*. at 79, 99, 107, 113, 115, 117, 118, 125.

C.    **Defendants' Statement of Material Facts**[12]

1.    **CNYPC SOTP**

At all relevant times, Plaintiff has been civilly confined in CNYPC SOTP pursuant to Article 10 of the MHL.  (Dkt. No. 199-1 at ¶ 1.)  The primary mission of the CNYPC SOTP is to provide secure custody, care, and treatment to persons adjudicated by the courts as requiring civil management in an in-patient setting pursuant to Article 10 of the MHL.  *Id*. at ¶ 3.  As set forth in the Legislative findings of Article 10 of the MHL, some of the goals of civil commitment are "protection of society, supervision of offenders and management of their behavior."  *Id*. at ¶ 5. The Commissioner of OMH is charged by law with developing the treatment program.  *Id*. at ¶ 4. Courts periodically review the progress of individuals under the custody, care, and treatment of CNYPC SOTP to determine if they no longer present such a danger to society that they may be released to community supervision.  *Id*. at ¶ 6.

Individuals under the custody, care, and treatment of CNYPC SOTP are offered therapeutic programming designed to reduce their risk to sexually re-offend.  *Id*. at ¶ 7. Therefore, if the residents choose not to participate, the reviewing court may continue to require in-patient treatment until the person has appropriately addressed his risk to sexually re-offend. *Id*. at 8.

CNYPC SOTP uses evidence-based methods of treatment services that are consistent with the best-known practices in the field of sex offender treatment.  *Id*. at ¶ 9.  As new research emerges and "best practices" evolve, CNYPC SOTP adapts its services accordingly, which may include the creation of new groups, modification of existing groups, or discontinuation of groups

---

[12]  The following facts were asserted and supported with accurate record citations by Defendants in their statement of material facts.  (Dkt. No. 199-1.)

which no longer reflect effective treatment modalities. *Id*. at ¶ 10. Treatment services, targeted

at reducing the person's risk of sexually re-offending, are designed to enhance the individual's

treatment engagement, develop self-regulation skills, manage sexual deviancy, and assist the

individual in developing pro-social attitudes and behaviors. *Id*. at ¶ 11. It is of the utmost

importance to provide treatment at CNYPC SOTP in a safe and secure treatment environment.

*Id*. at ¶ 12.

### 2.    Treatment Models

In 2015, at the time Plaintiff commenced the action Brooks I, the treatment program for

individuals civilly committed as dangerous sex offenders under Article 10 of the MHL was a

four-phase program. *Id*. at ¶ 13. The program's framework was grounded in the Risk-Need-

Responsivity Model, which matched the offender's risk for sexual recidivism to the level of

services provided, targeted the offender's dynamic research-based risk factors in treatment, and

maximized the offender's abilities to benefit from treatment tailored to his learning style,

motivation, abilities and strengths. *Id*. at ¶ 14. The four-phase program was designed so that the

resident progressed through treatment in an incremental manner, acquiring skills and knowledge

which are built upon in subsequent phases. *Id*. at ¶ 15. The resident's progress was dependent

upon his ability to complete the treatment goals of each phase and was not based upon a

prescribed time frame. *Id*. at ¶ 16. However, there was no requirement that the residents take

advantage of the program. *Id*. at ¶ 18.

In December of 2015, the OMH Bureau of Institutional Sex Offender Treatment

("BISOT") replaced the four-phrase treatment program. *Id*. at ¶ 25. The new treatment program

better elucidates the treatment targets associated with everyone's level of risk and enables a more

fluid measurement of progress on each treatment target. *Id*. These programmatically defined

treatment targets are evidence-based dynamic risk factors linked to sexual offense recidivism. *Id*. at ¶ 26.

Under this model, the stages of progress are based on the principles of the Transtheoretical Model of Change, which proposes that individuals move through a series of stages (precontemplation/contemplation, preparation, action, and maintenance) when making changes to problematic attitudes and behaviors. *Id*. at ¶ 28. This model provides a clearer understanding by residents of their treatment needs and progress toward meeting those needs and allows for programming and privileges to better mirror the complexity of an individual's progress and changing risk. *Id*. at ¶ 30. Since a resident may not progress in a linear fashion in all treatment targets, programming assignments under this model closely match progress in each specific area. *Id*. at ¶ 31.

### 3.    Treatment Tracks

From the time residents are admitted to CNYPC SOTP and continuing through the course of their treatment, their needs, abilities, and strengths are assessed to determine which treatment track within the facility is most appropriate. *Id*. at ¶ 32. There are four treatment tracks for the residents at CNYPC SOTP: (1) serious and persistent mental illness; (2) cognitively impaired; (3) psychopathy; and (4) conventional. *Id*. at ¶ 33. The decision as to which treatment track each resident is assigned is a clinical decision, which accounts for how the resident's individual needs can best be met. *Id*. at ¶ 41. Regardless of treatment track, every resident is offered comprehensive programming including behavioral therapy, didactic/psycho-educational therapy, process-oriented treatment, pro-social skill development, and education/vocational training. *Id*. at ¶ 34. The treatment track for those with psychopathy or high psychopathic traits is also known as Maintaining a Pro-Social Stance ("MAPSS"). *Id*. at ¶ 35.

### 4.    MOD Program

The MOD program "is designed to decrease aggressive and impulsive behaviors while increasing motivation to engage in traditional tracks of the CNYPC SOTP." *Id.* at ¶ 54. MOD is a treatment modality designed to separate aggressive and/or treatment resistant residents from residents who are behaviorally stable and engaged in the treatment process. *Id.* at ¶ 55. The ultimate goal of MOD is to assist the resident in learning and demonstrating sustained pro-social behaviors so that he may be returned to a traditional treatment track in the SOTP program consistent with his needs as well as the treatment needs of the other residents and the administrative/operational needs of the program. *Id.* at ¶ 56.

While MOD consists of administrative restrictions, it is not a form of punishment, rather it is one component of the clinical treatment program that focuses on stabilizing purposeful dangerous behaviors and/or severe treatment interfering behaviors while offering the opportunity for the resident to develop increased self-management skills. *Id.* at ¶ 65. There are three levels of MOD: Program MOD, Unit MOD, and Room MOD. *Id.* at ¶ 57.

Program MOD is used when a resident provides reasonable assurances that he does not present a threat to the safety and security of staff and residents of the SOTP but is unwilling to control antisocial behaviors. *Id.* at ¶ 59. The treatment team meets with the resident after placement on MOD status and identifies the targeted behavior(s) the resident needs to address. *Id.* at ¶ 66. Residents on Program MOD continue to be offered programming as do residents not on MOD status. *Id.* at ¶ 67. Generally, while in Program MOD, the resident may continue to attend his treatment groups." *Id.* at ¶ 60.

Acts of physical aggression or direct threats of the same may lead to Unit or Room MOD. *Id.* at ¶ 61. Unit or Room MOD is used when the resident's treatment team determines that

doing so would be in the resident's best interest or that the placement is necessary to maintain a therapeutic environment for the other residents in the CNYPC SOTP. *Id*. at ¶ 68. Some MOD placements may require separate residential housing that is designed to provide a safe and therapeutic environment to individuals who have demonstrated aggressive behaviors or other persistent patters [sic] of treatment interfering behaviors. *Id*. at ¶ 69. The purpose of such placement is to engage the resident in therapeutic modalities that are designed to decrease aggressive and impulsive behaviors and encourage voluntary and effective participation in traditional tract modalities. *Id*. at ¶ 70. Decisions about appropriate corrective action are always based on the clinical needs of a given resident. *Id*. at ¶ 71.

When necessary, residents may be transferred to a separate ward to meet their treatment needs. *Id*. at ¶ 73. In such instances, there may be multiple residents involved in a large-scale event or instances when multiple residents have engaged in their own individual behavior that interferes with treatment. *Id*. at ¶ 72. This type of MOD has separate programming where residents are asked to discuss and process what occurred, the reasons why they chose to engage in the behavior, and alternative thoughts and behaviors that could be implemented in the future. *Id*. at ¶ 74. Each resident's behavior continues to be assessed and the treatment team meets weekly to discuss the resident's readiness to re-enter a unit with a traditional treatment track. *Id*. at ¶ 75. As the resident begins to demonstrate the skill set needed to maintain behavioral control and appropriate pro-social behaviors, he is advanced and may attend group sessions off the unit, ultimately transferring back to a unit with traditional track SOTP therapeutic programming. *Id*. at ¶ 76.

### 5.    Privileges

Rights and privileges are not the same.  *Id*. at ¶ 78.  Pursuant to MHL Section 33.02, each resident at CNYPC SOTP has certain rights and there are instances when an individual's rights may be restricted based on legitimate security and/or individual clinical concerns in order to ensure a safe and therapeutic environment for other residents who are engaged in the CNYPC SOTP [] as well as staff and the community.  *Id*. at ¶ 79.  Privileges, in contrast, are opportunities that are provided or withdrawn based upon a variety of factors, including the resident's living unit, the resident's level of participation and effort in treatment, and the resident's demonstrated ability to enjoy the privileges appropriately and without misuse or abuse.  *Id*. at ¶ 80.  Pursuant to CNYPC SOTP Policy 5.22, privileges are earned by a resident consistent with his progress in treatment and his ability to comply with facility rules.  *Id*. at ¶ 81.  These privileges may include recreational or leisure activities, vocational opportunities, or additional personal property.  *Id*. at ¶ 82.  A privileging system is an effective treatment tool which assists individuals in developing more effective strategies to increase positive behavior.  *Id*. at ¶ 85.  Earning additional privileges is a reward for pro-social behavior whereas anti-social behavior may result in the loss of privileges.  *Id*. at ¶ 86.  These negative consequences serve as a learning tool for the resident to comply with program rules and expectations.  *Id*. at ¶ 87.

Residents who engage in treatment interfering behaviors may experience a loss of privileges and other consequences.  *Id*. at ¶ 89.  As noted in the CNYPC SOTP Resident Handbook, treatment interfering behaviors include, but are not limited to, abusive language/behavior, contraband, interference with staff duties, obstructing windows and doors, sexual behaviors (including exposing intimate parts and masturbating in public or at times when there is anticipated staff contact such as regular rounds), as well as threatening others.  *Id*. at ¶

90.  The extent of the consequences for a treatment interfering behavior is based on the damage done, the potential dangerousness of the behavior, and whether the resident has engaged in similar behaviors in the past.  *Id*. at ¶ 91.  The consequences may include, but are not limited to, activities to correct the behavior, restriction from a specific area, or the loss of a privilege.  *Id*. at ¶ 92.

The treatment team regularly meets with the resident and clearly identifies the targeted behavior(s) the resident needs to address.  *Id*. at ¶ 93.  A restriction of or loss of a privilege is not a form of punishment, but rather is one component of the clinical treatment program that focuses on stabilizing purposeful dangerous behaviors and/or severe treatment interfering behaviors while offering the opportunity for the resident to develop increased self-management skills.  *Id*. at ¶ 94.

### 6.    Security

All the residents confined at CNYPC SOTP have been committed to OMH custody by court order.  *See id*. at ¶¶ 44-46.  CNYPC is not a traditional OMH hospital as defined under the law.  *Id*. at ¶ 44.  By design and operation such facilities' security conditions are modeled after those of a medium security prison.  *Id*.  A large portion of the residents at CNYPC SOTP are individuals with psychopathic traits, high levels of anti-social and manipulative behaviors as well as more predatory type behaviors, which present challenges to staff in maintaining the safe and therapeutic treatment milieu.  *Id*. at ¶ 51.

## II.    STANDARD OF REVIEW

Summary judgment may be granted only if the submissions of the parties taken together "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the Court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary

judgment." *Kingwood v. Rourke*, No. 9:97-CV-1906 (NAM/GLS), 2002 WL 31309240, at *2

(N.D.N.Y. Sept. 3, 2002) (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, *2

(S.D.N.Y. May 16, 2001)).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he

fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted

automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1)

determine what material facts, if any, are undisputed in the record; and (2) assure itself that,

based on the undisputed material facts, the law indeed warrants judgment for the defendants. *Id.*

at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001);

L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material

Facts, the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that

(1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is

proceeding *pro se*, has been specifically advised of the potential consequences of failing to

respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)(3);[13] *Vermont Teddy

Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

As noted above, Plaintiff failed to respond to Defendants' motion for summary judgment.

(*See* Dkt. No. 213.) Plaintiff's failure to oppose Defendants' motion results in the admission of

properly supported facts, however the Court must still ensure those facts show Defendants are

entitled to judgment as a matter of law. *See Jackson*, 766 F.3d at 194 (a non-response to a

---

[13] Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement
of material facts. L.R. 7.1(a)(3). Under the rule, the response "shall mirror the movant's
statement of material facts by admitting and/or denying each of the movant's assertions in
matching numbered paragraphs. Each denial shall set forth a specific citation to the record
where the factual issue arises." *Id.*

summary judgment motion does not risk default because "the district court must ensure that each statement of material fact is supported by the record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed") (citing *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242-46 (2d Cir. 2004) (even when a motion for summary judgment is not opposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law)).

Moreover, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts, as did the Court. (Dkt. Nos. 196-45; 197.) Accordingly, pursuant to Local Rule 7.1(a)(3) and Fed. R. Civ. P. 56(e)(2), the Court deems all the properly supported facts in Defendants' statement of material facts (Dkt. No. 199-1), which are not controverted by the factual allegations in the verified consolidated complaint (Dkt. No. 159), to be undisputed for the purposes of this motion. *See Hilson v. Beaury*, No. 9:13-CV-0606 (BKS/DEP), 2016 WL 1069954, at *2 (N.D.N.Y. Mar. 18, 2016); *Rosario v. Anson*, No. 9:12-CV-1506 (BKS/CFH), 2015 WL 5692550, at *4 (N.D.N.Y. Sept. 28, 2015).

## III.    DISCUSSION

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights [but] provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

Additionally, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation and other citations omitted).

Moreover, "[t]o establish the liability of a supervisory official under [Section] 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (citation omitted).  The Second Circuit has held that supervisor liability pursuant to Section 1983 can be shown in one or more of the following ways: (1) direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[14]

As stated, Plaintiff's remaining claims in Brooks I are: (1) Fourteenth Amendment due process claims against Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco regarding Plaintiff's placement in the MOD Unit in 2008; (2) Fourteenth Amendment due process claims that Defendants Bosco, Nowicki, Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco denied Plaintiff adequate mental health care; (3) Fourteenth Amendment conditions of confinement claims regarding the punitive nature of his confinement against Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco; and (4)

---

[14]  *Iqbal* has . . . engendered conflict . . . about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict.  *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.'" (citation omitted)).

First Amendment denial of access to the courts claims against Defendants Hogan, Miraglia, Bosco, and Nowicki.  (Dkt. Nos. 34, 71, 158, 159.)

Remaining claims and Defendants in Brooks II are First Amendment retaliation and Fourteenth Amendment due process claims regarding his restrictive confinement, lack of adequate mental health treatment, and denial of adequate clothing against Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan.  (Dkt. No. 158, 159; Brooks II, Dkt. No. 4.)

Defendants seek dismissal of the consolidated complaint in its entirety.  (Dkt. No. 196.) Defendants argue they are entitled to summary judgment because Plaintiff's consolidated complaint generally consists of nothing more than conclusory allegations and legal conclusions, is largely devoid of any factual allegations specific to a particular Defendant, many allegations are time-barred by the applicable three-year statute of limitations, Plaintiff's claims fail as a matter of law, and they are entitled to qualified immunity.  (Dkt. No. 199-2.)  As noted, Plaintiff has not responded to the motion.  The Court addresses Defendants' contentions below to the extent necessary.

### A.    Statute of Limitations

As an initial matter, Defendants argue many of Plaintiff's claims are time-barred.  (Dkt. No. 199-2 at 9-10.)  Specifically, Defendants seek summary judgment on statute of limitations grounds for all claims arising before January 26, 2012, in Brooks I and before May 25, 2014, in Brooks II.  *Id.*

The statute of limitations for Section 1983 claims in New York is three years.  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).  "While state law supplies the statute of

limitations for claims under § 1983, federal law determines when a federal claim accrues."

*Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (internal quotation mark omitted).  Under

federal law, a Section 1983 claim accrues when the plaintiff knows or has reason to know of the

injury that constitutes the basis of his action.  *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d

Cir. 2002).  That is so even if "the full extent of the injury is not then known or predictable."

*Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388

(2007)).

As set forth above, Plaintiff commenced the action in Brooks I on January 26, 2015, and

the action in Brooks II on May 25, 2017.  Therefore, the Court agrees with Defendants that

Plaintiff's claims arising before January 26, 2012, in Brooks I, and May 25, 2014, in Brooks II

are time-barred, and Defendants are entitled to summary judgment on such claims.  (Dkt. No.

199-2 at 9-10.)  As explained in their memorandum of law, due to the physical length of the

consolidated complaint, as well as the voluminous allegations contained therein, Defendants

address the timeliness of any relevant allegations in their discussion of Plaintiff's causes of

action.  *Id*. at 10.  For ease of reference, the Court will do the same.

**B.    Plaintiff's Claims Related to His MOD Placement in 2008 in Brooks I**

In Brooks I, Plaintiff claims his placement in the MOD Unit—a more restrictive form of

confinement—was done without procedural due process.  (Dkt. No. 159 at 25-44.)  Defendants

argue Plaintiff's claims related to his MOD placement in 2008 are time-barred.  (Dkt. No. 199-2

at 10-11.)  The Court agrees.

According to Plaintiff, he was transferred to the MOD Unit on October 18, 2008, and was

kept there until November 9, 2010, for punitive reasons and without justification.  (Dkt. No. 159

at 27, 29, 34, 37, 52.)  Plaintiff describes the MOD Unit as entailing greater liberty restrictions

than those imposed upon the general population at CNYPC and claims he was not afforded "appropriately applicable due process protections, in the form of 'an opportunity to receive notice of any infractions(s)' 'an opportunity to defend against what would have been used against him,' and to be afforded a hearing.'"  *Id*. at 43.

Here, because these events allegedly occurred and ended well before January 26, 2012, which is three years before Plaintiff commenced Brooks I on January 26, 2015, the Court finds any causes of action based upon these events are time-barred by the applicable three-year statute of limitations.  (Dkt. No. 199-2 at 10-11; *see* Part III.A., *supra*.)  As noted, Plaintiff has not responded to address the timeliness of his claims.  Therefore, regarding Plaintiff's placement in the MOD Unit from approximately 2008 through 2010, the Court recommends granting summary judgment to Defendants Sawyer, Maxymillian, Gonzalez, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco, and also recommends dismissal of the claim against Bahl under 28 U.S.C. § 1915(e) for failure to state a claim.

### C.    Plaintiff's Conditions of Confinement Claims in Brooks I

Plaintiff alleges his conditions of confinement at CNYPC SOTP, although disguised as treatment, are punitive in nature and, therefore, violate his substantive due process rights under the Fourteenth Amendment.  (Dkt. Nos. 159 at 25-53; 35 at 8-17, 71.)  Defendants move for summary judgment arguing, *inter alia*, (1) any claims based on Plaintiff's conditions of confinement prior to January 26, 2012, are time-barred; (2) the SOTP at CNYPC has been found medically appropriate and supported by legitimate governmental interests; and (3) there is no evidence Plaintiff's conditions of confinement at the CNYPC were imposed arbitrarily rather than because of legitimate penological concerns.  (Dkt. No. 199-2 at 11-18.)  The Court agrees with Defendants.

1.      **Legal Standard**

The Fourteenth Amendment Due Process Clause provides that "[n]o State shall . . .

deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend.

XIV, § 1.  Individuals who have been civilly committed retain substantive due process rights.

*See Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982).  "In determining whether a substantive

right protected by the Due Process Clause has been violated, it is necessary to balance 'the

liberty of the individual' and 'the demands of an organized society.'"  *Youngberg*, 457 U.S. at

320 (quotations omitted).  "In seeking this balance [,] . . . the Court has weighed the individual's

interest in liberty against the State's asserted reasons for restraining individual liberty."  *Id.*

"[L]iability may be imposed only when the decision by the professional is such a substantial

departure from accepted professional judgment, practice, or standards as to demonstrate that the

person responsible actually did not base the decision on such a judgment."  *Id.* at 323.[15]  "In

considering such claims, courts must 'show deference to the judgment exercised by qualified

professional[s],' whose decisions are entitled to a 'presumption of correctness.'"  *Yeldon v.*

*Hogan*, No. 9:08-CV-769, 2010 WL 983819, *4 (N.D.N.Y. Mar. 15, 2010) (quoting *Youngberg*,

457 U.S. at 322-24).[16]  Importantly "the state's interest in maintaining order and security is not

punitive in purpose or characters, and remains valid in institutions of civil commitment."  *Id.*

*Ahlers v. Rabinowitz*, 684 F.3d 53, 60-61 (2d Cir. 2012) (citing *Youngberg*, 457 U.S. at 320).

---

[15]  The Supreme Court explained that "[b]y 'professional' decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded."  *Youngberg*, 457 U.S. at 323 n.30.

[16]  The Supreme Court explained, "By so limiting judicial review of challenges to conditions in state institutions, interference by the judiciary with the internal operations of these institutions should be minimized.  [T]here certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions."  *Youngberg*, 457 U.S. at 322-23.

The state also has an interest in treating the civilly committed individual. *Id.*; *see Allen v. Illinois*, 478 U.S. 364, 373 (1986) ("the State serves its purpose of *treating* rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment.") (emphasis in original).

Courts in this District have previously addressed the SOTP at CNYPC and found the program to be clinically appropriate and supported by legitimate interests. *See, e.g.*, *McChesney v. Hogan*, No. 9:08-CV-0163 (FJS/DEP), 2010 WL 3602660, at *10-12 (N.D.N.Y. Aug. 17, 2010), *report-recommendation adopted by* 2010 WL 3584360 (N.D.N.Y. Sept. 7, 2010) (dismissing claim wherein a plaintiff-sex offender committed to CNYPC alleged that the SOTP was punitive in nature, he was not permitted to participate in program development, and the procedures associated with the treatment program violated his rights, where the "record before the court unequivocally establishes that the policies now challenged by the plaintiff were designed and implemented by the defendants, in their professional judgments, to further the substantial government interest in preserving safety and security within the facility and in providing the state-mandated SOTP."); *Yeldon v. Hogan*, 2010 WL 983819, at *5 (finding the MOD program at CNYPC SOTP was implemented for legitimate reasons made by qualified professional and dismissing the complaint where the plaintiff "offered no evidence to rebut the presumption of correction that must be afforded such a decision"), *aff'd* 400 F. App'x 582 (2d Cir. 2010) ("for substantially the same reasons stated by the magistrate judge in his thorough and well-reasoned decision).

As to placement on MOD status, "courts in this circuit have repeatedly found that placement on MOD status at CNYPC does not implicate the Due Process Clause." *Aiello v. Lamitie*, No. 9:16-CV-53 (MAD/CFH), 2020 WL 918989, at *5 (N.D.N.Y. Feb. 26, 2020)

(finding civilly committed individuals at CNYPC SOTP had no liberty interest in "avoiding MOD status") (citing *Groves v. New York*, No. 9:09-CV-0412 (GLS/DEP), 2010 WL 1257858, at *10 (N.D.N.Y. Mar. 1, 2010) (citing *Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996) (holding civilly confined individuals do not have a right to be placed in the least restrictive appropriate treatment environment)); *Haden v. Hellinger*, No. 9:14-CV-0318 (GLS/DEP), 2016 WL 8673144, at *13 (N.D.N.Y. Sept. 30, 2016); *June*, 2014 WL 502536, at *4; *Yeldon*, 2010 WL 983819, at *4-5; *McChesney*, 2010 WL 3602660, at *12.

### 2. Analysis

As an initial matter, the Court finds Plaintiff's conditions of confinement claims in Brooks I relating to his alleged punitive confinement prior to January 26, 2012, including but not limited to his placement in the MOD Unit from 2008 through 2010, and alleged punishments imposed following physical altercations with other residents and staff at CNYPC on September 8, 2010, and January 8, 2012, are time-barred by the three year statute of limitations.  (*See* Part III.A., *supra*.)  Turning to the merits, the Court finds Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco are entitled to summary judgment.

Defendant Forshee, a licensed psychologist and Chief Psychologist at CNYPC SOTP, states "Plaintiff was placed on MOD programming on more than one occasion as the result of his many episodes of treatment interfering behavior."  (Dkt. No. 199-3 at ¶¶ 1, 48.[17])  CNYPC's policy states that:

---

[17]  Defendant Forshee has held this position since April 2015.  (Dkt. No. 199-3 at ¶ 1.) She has been employed at CNYPC SOPT as a psychologist since 2006.  *Id*.  As Chief Psychologist, she provides clinical direction, oversight, and supervision of the CNYPC SOTP and its clinical staff.  *Id*.

> Residents who engage in treatment interfering behaviors may experience a loss of privileges and other consequences. The extent of the consequences for a treatment interfering behavior is based on the damage done, the potential dangerousness of the behavior, and whether the resident has engaged in similar behaviors in the past. The consequences may include activities to correct the behavior, restriction from a specific area, the loss of a privilege or a reduction in a phase of treatment.

(Dkt. No. 196-13 at 20.) Treatment interfering behaviors and activities include, but are not limited to, "[u]se of profanity directed at a person, insulting/demeaning language, degrading comments of any kind, or verbal threats[;]" "any intentional act that attempts or results in injures or pain to another person, or threatens the safety of another person[;]" "[r]efusal to follow directions, orders, or facility policies/procedures[;]" "behavior intended to provoke another resident into aggressive actions;" and "[s]exual behavior[,]" *i.e.*, "[r]esidents may not have any type of sexual contact with another person or engage in any other prohibited sexual behavior." *Id*. at 21-25. Prohibited sexual behavior includes "exposing intimate parts to others, exposing one's underwear to others, masturbating in public or at times when there is anticipated staff contact (such as regular rounds), masturbating over clothing, making sexual gestures, or making sexual comments." *Id*. at 25.

As described above, MOD programming is designed to decrease aggression and impulsive behaviors while increasing motivation to engage in traditional tracks of the CNYPC SOTP. (Dkt. No. 199-3 at ¶ 42). The purpose of placing a resident on MOD status "is to engage the resident in therapeutic modalities that are designed to decrease aggressive and impulsive behaviors and encourage [the resident's] voluntary and effective participation in traditional track SOTP modalities." *Id*. at ¶ 50.

Defendant Forshee states that "[w]hile MOD consists of administrative restrictions, it is not a form of punishment, rather it is one component of the clinical treatment program that

focuses on stabilizing purposeful dangerous behaviors and/or severe treatment interfering behaviors while offering the opportunity for the resident to develop increased self-management skills." *Id.* at ¶ 47. She further explains "[t]he treatment team meets with the resident after placement on a MOD status and clearly identifies the targeted behavior(s) the resident needs to address. Residents on MOD continue to be offered programming as do residents not on MOD status." *Id.*

Defendant Forshee further explains privileges are opportunities that are provided or withdrawn based upon a variety of factors, including the resident's living unit, the resident's level of participation and effort in treatment, and the resident's demonstrated ability to enjoy the privileges appropriately and without abuse. *Id.* at ¶ 31. As such, privileges are earned by a resident consistent with his progress in treatment and his ability to comply with facility rules. *Id.* at ¶ 32. Privileges may include recreational activities, leisure activities, vocational activities, or additional personal property. *Id.* According to Defendant Forshee, a privileging system is an effective treatment tool which assists individuals in developing more effective strategies to increase positive behavior. *Id.* at ¶ 34. Thus, earning additional privileges is a reward for pro-social behavior, whereas anti-social behavior may result in the loss of privileges. *Id.* These negative consequences should serve as a learning tool for the resident to comply with program rules and expectations. *Id.*

Defendant Maxymillian, a licensed psychologist and former Chief of Mental Health Treatment Services at CNYPC SOTP, further explains that many residents, including Plaintiff, have significant anti-social attitudes (*i.e.*, disregard for the violation of the rights of others characterized by failure to conform to societal norms, deceitfulness, impulsivity, irritability, aggressiveness, reckless disregard for the safety of others, irresponsibility, and/or lack of

remorse for hurting or mistreating others) that affect and impair their ability to address situations in a healthy, pro-social manner. (Dkt. No. 199-15 at ¶¶ 1, 2, 4.[18])

 Turning to some of the specific incidents referenced by Plaintiff, the record is replete with justifications made by Defendants, in their professional judgment, to place Plaintiff on MOD status, restrict his privileges, and/or direct him to complete a BCA as a result of various "treatment interfering behavior."

 One such non-time barred incident occurred on May 8, 2014. *Id.* at ¶ 113. Defendant Maxymillian states on that date Plaintiff was arguing with another resident in a loud tone in the day room. *Id.* Staff attempted to redirect Plaintiff to lower his voice. *Id.* at ¶ 114. In response, Plaintiff raised his voice and stated, "this is not a fucking library I can say whatever the fuck I want and be as loud as I want." *Id.* (emphasis omitted). Plaintiff was instructed to leave the day room to calm down because his behavior was upsetting his peers. *Id.* at ¶ 115. While he was exiting, Plaintiff shouted, "go ahead and drop the phone on me. I don't give a fuck when I'm pissed I raise my fucking voice." *Id.* at ¶ 116. (emphasis omitted). Plaintiff was instructed to go to his room. *Id.* Based on this behavior, Defendant Maxymillian approved a loss of day room privileges for 14 days. *Id.* at ¶ 117. Defendant Maxymillian also agreed with the recommendation that Plaintiff complete a BCA. *Id.* at ¶ 118.[19] The undisputed record indicates

---

[18] Since February 2016, Defendant Maxymillian has been employed by CNYPC as Acting Forensic Program Administrator. (Dkt. No. 199-15 at ¶ 1.) Prior to this position, she was employed by CNYPC as Chief of Mental Health Treatment Services at Marcy Regional Mental Health Unit. *Id.* Between 2007 and March 2015, she was Chief of Mental Health Treatment Services at CNYPC SOTP. *Id.* In this position, she provided clinical direction, oversight and supervision of the sex offender treatment program and its clinical staff. *Id.*

[19] The goal of a BCA is to develop a prevention strategy so that if the triggering event were to arise in the future, the person would be able to appropriately respond rather than engage in the problematic behavior. (Dkt. No. 199-1 at ¶ 120.) The person identifies what triggered the behavior, how he responded to that trigger, and what consequences resulted from the behavior.

the 14-day loss of day room privileges Plaintiff received fell within existing regulations and policies and was narrowly tailored to address the clinical and safety concerns presented by Plaintiff.  *Id*. at ¶ 121.  Furthermore, completion of a BCA is an appropriate clinical intervention. *Id*.

In her declaration, Defendant Maxymillian also discusses an October 14, 2014, incident, during which Plaintiff asked staff why the day room was closed that evening.  (Dkt. No. 199-15 at ¶ 13.)  Staff explained that a decision had been made to close the day room.  *Id*.  Plaintiff demanded an explanation and when he was dissatisfied with the response, he became disrespectful toward staff.  *Id*.  Plaintiff stated, "you are a liar and . . . I will be watching for you because Karma is a bitch."  *Id*.  (emphasis omitted).  Plaintiff then attempted to incite other residents.  *Id*.  As a result of this inappropriate behavior, Defendant Maxymillian approved a Loss of Privileges.  *Id*. at ¶ 14.  Due to his continuing negative behaviors toward staff regarding use of the day room, Plaintiff lost day room privileges for seven days and he was asked to complete a BCA.  *Id*.  Defendant Maxymillian states the seven days of MOD privileging Plaintiff received fell within existing regulations and policies and were narrowly tailored to address the clinical and safety concerns presented by Plaintiff and that completion of a BCA is an appropriate clinical intervention.  *Id*. at ¶ 15.

On January 17, 2015, a female staff member witnessed Plaintiff attempting to tuck his erect penis back into his sweatpants.  *Id*. at ¶ 16.  When the staff member asked Plaintiff what he was doing, he said nothing.  *Id*.  A male staff member observed Plaintiff returning to his dorm room and asked the female staff member what had transpired.  *Id*.  She responded that Plaintiff

---

*Id*. at ¶ 119.  The person should then be able to identify better solutions to have addressed the problem.  *Id*.

had been masturbating in the bathroom doorway while looking at her. *Id*. Plaintiff approached the male staff member after the female staff member left the ward and stated, "sorry that it happened on your shift." *Id*. (emphasis omitted). Plaintiff admitted he had been masturbating and agreed it was not appropriate behavior. *Id*. Plaintiff further stated he made a conscious choice to masturbate in the presence of staff, stating, "I'm a man and I have needs." *Id*. (emphasis omitted).

On January 22, 2015, Plaintiff was involved a verbal altercation with another resident. *Id*. at ¶ 17. Due to this inappropriate and willful behavior, Defendant Maxymillian approved a Loss of Privileges, whereby Plaintiff was placed on MOD privileging for 28 days and asked to complete a BCA. *Id*. Plaintiff refused to complete the BCA. *Id*. Defendant Maxymillian states the 28 days of MOD privileging Plaintiff received fell within existing regulations and policies and were narrowly tailored to address the clinical and safety concerns presented by Plaintiff and that completion of a BCA is an appropriate clinical intervention. *Id*. at ¶ 18.

On May 9, 2015, around 6:00 a.m., Plaintiff was observed looking at female staff through a mirror while brushing his teeth. (Dkt. No. 199-3 at ¶ 55.) On that same day, around 2:00 p.m., Plaintiff was observed by female staff in the resident bathroom with his penis exposed and was immediately directed to put his penis away. *Id*. The next day, on May 10, 2015, around 10:00 p.m., Plaintiff and a fellow resident engaged in a verbal altercation in the dayroom on Ward 604. *Id*. at ¶ 54. After staff escorted that resident outside of the dayroom, Plaintiff "advanced" toward another resident, and in return, that resident struck Plaintiff. *Id*. A "red dot emergency" was activated and both residents were redirected. *Id*. The other resident was removed from Ward 604. *Id*.

According to Defendant Forshee, because of the totality of these negative behaviors, Defendant Solovieva, a psychiatrist, removed Plaintiff from Ward 604 and placed him on Ward 504 from May 11, 2015, to May 15, 2015. *Id*. at ¶ 56.[20] "The ward move was done both to ensure the safety of other residents as well as to deal with his continuing clinically inappropriate behavior of openly masturbating." *Id*. Defendant Forshee states this placement was within existing regulations and policies and was narrowly tailored to address the clinical and safety concerns presented by Plaintiff. *Id*. at ¶ 58.

Other incidents referenced by Plaintiff fare no better. Records indicate Plaintiff was placed on MOD privileging status after exposing himself in the day room on April 28, 2014, after standing in the day room with his pants down and his penis in his hands on November 5, 2014, and openly masturbating in the bathroom in a place where he could see staff on March 31, 2015. (Dkt. No. 35 at 14, 15, 17.)

Based on the foregoing, the Court finds Defendants have demonstrated that the conditions about which Plaintiff complains are clinically appropriate and supported by legitimate interest. The record evidence shows Plaintiff's conditions of confinement, including his

---

[20] Defendant Forshee states Ward 504 is similar if not identical in appearance to the ward to which Plaintiff was previously assigned, namely Ward 604. (Dkt. No. 199-3 at ¶ 56.) CNYPC SOTP is within the CNYPC hospital. *Id*. It is not a correctional facility and does not have any cells, nor is there any area in the facility akin to a special housing unit. *Id*. Each ward has individual resident rooms with a hospital door—there are no bars enclosing the room nor can the door be locked which could prevent a resident from leaving his room at any time. *Id*. If one-on-one observation has been ordered, staff are posted outside the resident's room to maintain visual contact. *Id*. The resident is not locked in his room. *Id*. Residents do not have the right to select which ward they will be housed on while at CNYPC SOTP. *Id*. at ¶ 57. Ward location is based on the clinical needs of the resident as well as the operational needs of the facility. *Id*. As a result of this incident, Plaintiff was moved to Ward 504. *Id*. Since CNYPC SOTP is not staffed to open wards for one resident, at the time he was moved to Ward 504, there would have been other residents who had engaged in their own forms of treatment interfering behaviors also on the Ward. *Id*. Plaintiff would not have been isolated on Ward 504, and there is no evidence Plaintiff was restricted from any activities while on Ward 504. *Id*.

placement on MOD status, denial of privileges, and direction to complete BCAs, were for legitimate reasons based on professional judgment.  Moreover, there is no indication Defendants departed substantially from accepted professional judgment, practice, or standards and, on this record, Plaintiff's conclusory allegations regarding the alleged punitive nature of his conditions of confinement fail to raise a triable issue of fact.

Lastly, Defendants note Plaintiff has asserted conditions of confinement claim against several Defendants who may not be considered "professional" under *Youngberg*.  (Dkt. No. 199-2 at 17.)  While the Second Circuit has applied the professional judgment standard to claims of substantive due process violations brought by involuntarily committed individuals against professionals, it has not specified which standard to apply to such claims brought against "non-professionals."  *See Surlock v. Delaney*, No. 5:11-cv-1121, 2016 WL 3200273, at *10 (N.D.N.Y. June 8, 2016).  When a decision made by a "non-professional" is at issue, this Court is inclined to apply the deliberate indifference standard.  *See, e.g., O'dell v. Bill*, No. 9:13-CV-1275 (FJS/TWD), 2015 WL 710544 (FJS/TWD), at *7-8 (N.D.N.Y. Nov. 25, 2014) (collecting cases), *report-recommendation adopted by*, 2015 WL 710544 (N.D.N.Y. Feb. 18, 2015); *see also McChesney*, 2010 WL 3613806, at *5 (finding security hospital treatment assistants at CNYPC were not professionals for purposes of the standard of review); *Vallen v. Carrol*, No. 02 Civ. 5666 (PKC), 2005 WL 2296620, at *8 (S.D.N.Y. Sept. 20, 2005) (finding the "substantial departure" standard did not apply where defendants were "low-level staff members" and "professionals made none of the challenged decisions").  Here, as discussed above, the record evidence demonstrates Plaintiff was placed on MOD status, suffered a loss of privileges, and/or was directed to complete a BCA as a result of his treatment interfering behavior and that the decisions and the alleged punitive conditions at issue were made by professionals, including

Defendants Maxymillian and Forshee, based on their professional judgment, and not by any "non-professional" Defendants. (*See, e.g.*, Dkt. Nos. 199-15 at ¶¶ 7, 11, 14, 17; 199-3 at ¶¶ 56, 60, 65, 68.) Nevertheless, to the extent Plaintiff challenges decisions made by "low level non-professionals" in Brooks I, which does not appear to be the case, the Court agrees that on this record, none of Defendants' actions rose to the level of deliberate indifference under the Fourteenth Amendment. (*See* Dkt. No. 199-2 at 17.)

Accordingly, for reasons explained above, the Court recommends granting summary judgment to Defendants Sawyer, Maxymillian, Gonzalez, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, and Tedesco, and also recommends dismissal of the claim against Bahl under 28 U.S.C. § 1915(e) for failure to state a claim.

### D.    Plaintiff's Condition of Confinement Claims in Brooks II

Plaintiff also challenges the punitive and restrictive nature of his conditions of confinement in Brooks II and notes his allegations "further substantiate" his due process claims in Brooks I. (Dkt. No. 159 at 76-133.) According to Plaintiff, he does not display violent tendencies, and identifies several instances in which he was improperly subjected to restrictive conditions and/or placed in the MOD Unit as "punishment" for his "exhibitionistic disorder." *Id*. at 124.

Defendants argue, *inter alia*, Plaintiff's conditions of confinement claims in Brooks II must be dismissed because Defendant Forshee's decisions, made in her professional judgment, to place Plaintiff on MOD status, impose a loss of privileges, and/or direct him to complete a BCA were narrowly tailored to address the clinical and safety concerns presented by Plaintiff's treatment interfering behaviors on the specific occasions referenced in the Brooks II complaint

and to encourage Plaintiff to participate in his mental health treatment regimen. (Dkt. No. 199-2 at 18-19.) The Court agrees.

### 1.    Legal Standard

As discussed above, when considering a due process claim arising out of liberty restrictions placed on persons who are civilly committed, a court must balance the resident's liberty interests against the relevant state interests. *Youngberg*, 457 U.S. at 319; *see also* Part III.C.1., *supra*. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Aiello*, 2020 WL 918989, at *5 (quoting *Youngberg*, 457 U.S. at 319).

### 2.    Analysis

Here, for reasons set forth below, the record evidence demonstrates that the alleged punitive and restrictive conditions of confinement at issue in Brooks II were made for legitimate reasons based on professional judgment. There also is no indication Defendants departed substantially from accepted professional judgment, practice, or standards.

In her declaration, Defendant Forshee states that at 8:35 p.m. on October 2, 2016, a resident (referred to as the "informant") informed staff that Plaintiff was masturbating in the bathroom on Ward 605. (Dkt. No. 199-3 at ¶ 59.[21]) Staff did not witness this act of masturbation but upon arrival in the resident bathroom, they directed Plaintiff to leave the bathroom. *Id*. When Plaintiff exited the bathroom, he entered the dayroom as the informant was exiting the dayroom. *Id*. The informant stated to Plaintiff, "I'm not trying to be a snitch or

---

[21] On initial review in Brooks II, the District Court also referenced the May 10, 2015, incident, discussed above in Part III.C.

anything but I'm tired of you guys standing around with your dicks out." *Id.* (emphasis omitted). Plaintiff responded, "Look man don't say shit to me." *Id*. (emphasis omitted). The informant proceeded to the bathroom and Plaintiff followed him as they continued to exchange words. *Id*. The residents continued to argue and then staff heard a commotion which sounded like a physical fight. When staff arrived, the informant was holding his head, which was bleeding, and Plaintiff was in a fighting stance. *Id.* Plaintiff stated, "'just because my knee is fuck[ed] up doesn't mean I can't fight." *Id.* (emphasis omitted). A "red dot emergency" was called and Plaintiff was escorted to a side room without physical incident. *Id*.

Records indicate Plaintiff stated to staff "[the informant] was being disrespectful and just because my leg is messed up my hands still work, I'm that same dude from docs. Whatever I'm in there doing is none of his business I don't say shit when I see dudes playing in other dudes butthole's or hiding in other dudes room." *Id.* (emphasis omitted). Consequently, Plaintiff was placed on 1:1 observation on Ward 605 by the psychiatrist, Defendant Solovieva, until October 3, 2016, at 5:15 p.m. *Id*.

Due to this inappropriate behavior, Defendant Forshee approved a Loss of Privileges on October 3, 2016. *Id*. at ¶ 60. Specifically, Plaintiff was given 28 days of MOD privileging and directed to complete a BCA. *Id*. Plaintiff was also moved to Ward 504 with other residents who had engaged in treatment interfering behavior. *Id*. at ¶ 61. The record indicates Plaintiff was permitted to use the dayroom but was not permitted to go off the ward. *Id*. He also completed the initially assigned BCA; however, after staff reviewed it, a second BCA was assigned to him to complete so he could address how he handled the situation after the verbal argument with the informant—something Plaintiff should have included in his initial BCA. *Id*. Plaintiff refused to

complete the additional BCA. *Id*. On October 18, 2016, Plaintiff was moved from Ward 504 to Ward 305. *Id*.

Thereafter, on October 26, 2016, at 10:30 a.m., staff noticed a towel covering Plaintiff's dorm room window. *Id*. at ¶ 63. The covering was observed for approximately 20 minutes, at which time he was asked to take down the towel. *Id*. Plaintiff complied with staff instruction; however, it was then witnessed that he was standing in his room naked with his penis fully erect and he was masturbating. *Id*. Staff directed him to put on clothes. *Id*. Records reflect that throughout the remainder of the day, Plaintiff became argumentative and demanding with staff as he was not permitted to return to his dorm room. *Id*.

Due to this inappropriate behavior, Defendant Forshee approved a Loss of Privileges on October 28, 2016, which, *inter alia*, extended his MOD privileging for 14 days and directed Plaintiff to complete a BCA. *Id*. at ¶ 65. Plaintiff refused to complete the BCA. *Id*.

At approximately 3:30 p.m. on March 4, 2017, staff was making rounds and observed Plaintiff's door had been propped open by a washcloth. *Id*. at ¶ 67. Plaintiff was not in his room at the time and staff removed the washcloth. *Id*. Upon his return, Plaintiff questioned who closed his door and upon hearing the female staff member's name, he began yelling and making veiled threats regarding masturbating toward the staff member. *Id*. He further yelled that the door belonged to him and the staff member was not allowed to touch it. *Id*.

Thereafter, Plaintiff confronted the female staff member and stated she should have approached him and requested that he close the door. *Id*. While staff attempted to redirect Plaintiff, he yelled, "this is not your ward, so don't come down here fucking with me because you know how I give it up." *Id*. (emphasis omitted). Records indicate Plaintiff was redirected to his room, briefly complied, and then returned to the hallway and continued to yell and

threaten the female staff member. *Id.* A red dot emergency was activated. As a result of this incident, Plaintiff was placed on 1:1 observation on Ward 305 by the psychiatrist, Defendant Golovko, until March 6, 2017, at 1:30 p.m. *Id.*

Defendant Forshee states that due to this inappropriate behavior, she approved a Loss of Privileges on March 6, 2017. *Id.* at ¶ 69. She further states that based on Plaintiff's disrespectful attitude towards staff as well as his threats to masturbate toward the female staff member, she approved MOD privileging for 14 days. *Id.* Defendant Forshee also agreed with the treatment team's recommendation that Plaintiff complete a BCA. *Id.* Records indicate Plaintiff denied that staff ever redirected him and denies that he stated he would masturbate to female staff. *Id.*

Defendant Forshee states that contrary to Plaintiff's assertions, the loss of privileges he received for his violent and disruptive behavior was not arbitrary and capricious and not retaliatory. *Id.* at ¶¶ 58, 66, 69. The privileging and ward placement fell within existing regulations and policies and were narrowly tailored to address the clinical and safety concerns presented by Plaintiff. *Id.* In her sworn declaration, Defendant Forshee declares residents on MOD continue to be offered programming as do residents not on MOD status and she states that any allegation by Plaintiff that he is not receiving treatment while on MOD status is erroneous. *Id.* at ¶ 47.

Based on the foregoing, the Court finds Plaintiff's restrictive conditions of confinement, including his placement on MOD status, denial of privileges, and direction to complete BCAs, were for legitimate reasons based on professional judgment. There is no indication that Defendants departed substantially from accepted professional judgment, practice, or standards. Further, as discussed above and to the extent Plaintiff challenges decisions made by non-

professionals in *Brooks II*, which does not appear to be the case, this Court is inclined to apply the deliberate indifference standard. (*See* Part III.C., *supra*.) However, on this record, the Court finds none of Defendants' actions rose to the level of deliberate indifference under the Fourteenth Amendment.

Accordingly, the Court recommends granting summary judgment to Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan on this claim.

### E.    Plaintiff's Procedural Due Process Claims in Brooks I and Brooks II

Plaintiff alleges his placement in the MOD in 2008—a more restrictive form of confinement—was done without due process of law in violation of the Fourteenth Amendment. (Dkt. No. 159 at 25-44.) However, as discussed above, any allegations related to Plaintiff's MOD status in 2008 are time-barred. *See* Part III.B., *supra*. Regardless, Defendants contend summary judgment is also warranted on the merits. (Dkt. No. 199-2 at 20-21 & n.4.[22])

### 1.    Legal Standard

To successfully state a claim under Section 1983 for denial of procedural due process, a plaintiff must show that he or she (1) possessed an actual liberty or property interest; and (2) was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted).

---

[22] As explained in their memorandum of law, Defendants address the merits of this claim to the extent Plaintiff has alleged a timely procedural due process with respect to his subsequent placements on MOD status in Brooks I and Brooks II. (Dkt. No. 199-2 at 20 n.4.)

2.    **Analysis**

Here, as Defendants correctly note, courts in this Circuit have repeatedly found that placement on MOD status at CNYPC does not implicate the Due Process Clause.  (Dkt. No. 199-2 at 20-21 (citing *Smith v. Hogan*, No. 9:09-CV-0554 (GTS/GHL), 2011 WL 4343978, at *10 (N.D.N.Y. Aug. 1, 2011), *report-recommendation adopted by* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011); *Haden*, 2016 WL 8673144, at *5 n.13 ("To the extent plaintiff's second amended complaint could be construed as asserting a procedural due process claim, however, it would nonetheless fail because there is no authority in this circuit for the proposition that plaintiff has a liberty interest in being assigned to any particular status at the CNYPC."); *Groves*, 2010 WL 1257858, at *9-10 (dismissing plaintiff's due process claim regarding change to MOD status); *see also Aiello*, 2020 WL 918989, at *5 (granting summary judgment to the defendants because the plaintiffs failed to establish an enforceable  liberty interest in avoiding MOD status).  Importantly, "where no liberty interests are at stake, no procedures are required."  *Gill v. Riddick*, No. 9:03-CV-1456 (NAM/RFT), 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

Accordingly, inasmuch as Plaintiff does not have a liberty interest in being assigned to any status at CNYPC, the Court finds dismissal is also warranted on the merits.  Therefore, the Court recommends granting Defendants' motion on this cause of action.

F.    **Plaintiff's Mental Health Treatment Claims in Brooks I and Brooks II**

Generally, Plaintiff claims Defendants Sawyer, Maxymillian, Gonzalez, Bahl, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, Tedesco, Coveleski, Dawes, Farnum, Hermann, LaRock, Larkin, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Hall, Kunkle, McCulloch, and Sullivan failed to provide him with adequate mental health treatment in violation of his Fourteenth Amendment due process rights.  (Dkt. No. 159 at 25-53, 92, 97, 101-

03, 106-07, 118, 124-26, 131-32.)  Defendants argue, *inter alia*, Plaintiff's claims must be

dismissed under *Youngberg*.  The Court again agrees with Defendants.

> ### 1.    Legal Standard

As discussed above, a person in non-punitive state custody has several interests protected

by due process, including an interest in adequate medical care and treatment.  *See Youngberg*,

457 U.S. at 324 (1982).  "To determine the substantive rights of a person involuntarily

committed to a state institution, the interests of the individual are balanced against the interests

of the state."  *Ahlers*, 684 F.3d at 61 (citing *Youngberg*, 457 U.S. at 320); *see also Yeldon*, 2010

WL 983819, at *4.  "In considering such claims, courts must 'show deference to the judgment

exercised by qualified professional[s],' whose decisions are entitled to a 'presumption of

correctness.'"  *Yeldon*, 2010 WL 983819, at *4 (quoting *Youngberg*, 457 U.S. at 322-24); *see

also Aiello*, 2020 WL 918989, at *5 ("[L]iability may be imposed only when the decision by the

professional is such a substantial departure from accepted professional judgment, practice or

standards as to demonstrate that the person responsible actually did not base the decision on such

a judgment.").  As noted, the state has an interest in maintaining order and security and in

treating the civilly committed individual.  *See Allen*, 478 U.S. at 373, *Kansas*, 521 U.S. at 368

n.4; *Ahlers*, 684 F.3d at 61.

> ### 2.    Analysis

Here, Defendants have submitted evidence demonstrating that CNYPC SOTP

implements a comprehensive sex-offender treatment program, which is the product of the

judgment of professionals in the field of sex-offender treatment reflecting the best practices for

treating the dangerous sex-offenders committed to the facility's care.  (Dkt. No. 199-3 at ¶¶ 70-

80.)

First, contrary to Plaintiff's allegations, as discussed in the affidavit of Defendant

Forshee, each resident, including Plaintiff, has an Individual Service Plan ("ISP").  (Dkt. No.

199-3 at ¶ 70.)  The ISP has enumerated goals for the resident to achieve as well as objectives to

achieve those goals.  *Id*. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████

Defendant Forshee explains that at each ISP meeting, the treatment team meets with the

resident to review individual goals and the methods for accomplishing those goals.  *Id.* at ¶ 73.

This meeting is meant to be a collaborative process in which new treatment plans are created,

assuming the resident is willing to participate.  *Id.*  The record reflects that except for his March

2012 ISP, Plaintiff has refused to sign any of his ISPs and in many instances, as reflected on his

ISPs, he has refused to attend the ISP meeting.  *Id*. at ¶ 72.  Defendant Forshee states that

regardless of Plaintiff's refusal to be involved with his treatment planning, the treatment team

creates an ISP based upon his individual needs and enrolls him in programs which address his

individual criminogenic needs.  *Id*. at ¶ 74.

Additionally, despite being enrolled in numerous programs, the record evidence

demonstrates that Plaintiff, in most instances, refused to attend group treatment, participate in the

group, or complete assignments.  *Id*. at ¶¶ 75-76.  Specifically, Defendant Forshee sets forth

approximately 37 documented examples where Plaintiff has refused to engage in treatment, some

of which include records documenting Plaintiff's acknowledgment that he intentionally masturbates in public and is "building a case to take to court." *Id.* at ¶ 75.[23]

Plaintiff also objects to his placement in the MAPSS treatment track.[24] The record evidence demonstrates that when residents are admitted to CNYPC SOTP, as well as through the course of their treatment, their needs, abilities and strengths are assessed to determine which treatment track within the facility is most appropriate. *Id.* at ¶ 22. Regardless of treatment track, every resident it offered comprehensive programming including behavioral therapy, didactic/psycho-education therapy, process-oriented treatment, pro-social skill development, and education/vocational training. *Id.* at ¶ 23.

The treatment track for those with psychopathy or high psychopathic traits known as MAPSS. *Id.* at ¶ 24. Defendant Forshee states psychopathy is a personality disorder that is characterized by a collection of affective, interpersonal, and behavioral traits. *Id.* These traits include grandiosity, superficial charm, shallow affect, pathological lying, manipulative behavior, poor behavioral controls, impulsivity, irresponsibility, and callous disregard for the feelings of

---

[23] Other records document Plaintiff's interest in a treatment group because he "wanted to see what it was about it and if he could use it against CNYPC in his lawsuit. He reported that he wanted to make sure [CNYPC is] not providing meaningful treatment." (Dkt. No. 199-3 at ¶ 75(q)); *see also id.* at ¶ 75(dd) (noting Plaintiff stated that he is "methodical and calculated" when it comes to his engagement in exhibitionistic behaviors. He reported that he would not discontinue his masturbatory behaviors and he wants to prove that he is not getting treatment.). Further, after Plaintiff's recent retention hearing held pursuant to N.Y. Mental Hyg. Law § 10.09 in New York Supreme Court, Oneida County, The Honorable Charles C. Merrell, J.S.C., noted that Plaintiff "continues to have issues complying with treatment and acting in an intimidating and aggressive manner toward others." (Dkt. No. 199-25 at 11.) Judge Merrell further stated that Plaintiff "resists attempts to curtail his exhibitionist behavior, despite repeated arrests and sanctions both in prison and in CNYPC. This behavior is relevant and material to [Plaintiff's] predisposition to and serious difficulty in controlling his sex offending behavior." *Id.* at 13. Judge Merrell concluded by noting, once again, that Plaintiff "is non compliant with treatment and has never completed a sex offense treatment program, and persists with sexually deviant behaviors despite repeated sanctions." *Id.* at 22.
[24] Plaintiff refers to his treatment tract as "MAPPS Trac." (Dkt. No. 159 at 52.)

others.  *Id*.  Individuals with high psychopathy frequently prey on others using charm, deceit, and violence to gratify their own personal needs.  *Id*.  As explained by Defendant Forshee, the Hare Psychopathy Checklist ("PCL-R") is a scoring instrument that measures the level of psychopathy.  *Id*.  It is a checklist of twenty items for which a person can receive a score of 0, 1 or 2.  *Id*.  The highest score a person can receive is 40.  *Id*.  While scores above 25 indicate the presence of high psychopathic traits, scores of 30 and above indicate the person has the condition of psychopathy.  *Id*.  Research indicates the presence of psychopathy increases a person's risk of sexual recidivism, and the MAPSS track targets this significant criminogenic factor.  *Id*. at ¶ 25.  Accordingly, the track is designed to assist residents in developing pro-social behaviors and in learning emotional and behavioral regulation.  *Id*.

Defendant Forshee explains the decision as to which treatment track each resident is assigned is a clinical decision which accounts for how the resident's individual needs can best be met.  *Id*. at ¶ 26.[25]  The record evidence demonstrates that in July 2010, Plaintiff was scored on the PCL-R.  *Id*. at ¶ 27.  ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ █ ████████████████████████

---

[25]  By way of background, Defendant Forshee explains that when CNYPC SOTP first opened, residents were placed in Phase I, Orientation and Treatment Readiness.  (Dkt. No. 199-3 at ¶ 26.) Residents in Phase 1 of the prior program model were not separated into separate treatment tracks.  *Id*.  Once a resident was advanced to Phase II, which indicated he was willing to participate in treatment and signed an Informed Consent for Treatment (which indicated the resident was willing to focus on his sex offending and his risk factors for sexual re-offense), a clinical decision would be made to place him in one of the treatment tracks: conventional, cognitively impaired , MAPSS, or those with a serious mental illness.

[26]  According to Plaintiff, he was assigned to the "MAPPS" [sic] track on November 9, 2010. (Dkt. No. 159 at 52.)

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

Although Plaintiff alleges on several occasions that he has not received "'meaningful' treatment, due to the unavailability of a physician either trained, or available here at CNYPC, that possess[es] adequate knowledge concerning exhibitionism[,]'" Defendant Forshee explains that specialized training in "exhibitionism" does not exist. (Dkt. Nos. 159 at 28, 48, 199-3 at ¶ 78.[27]) However, the record demonstrates CNYPC SOPT offers a wide array of programs to deal with the needs of those who have been ordered to civil confinement. *Id.* at ¶ 76. Each group is designed to address targeted needs that have caused each resident to engage in sexual offending conduct so that he can develop pro-social behaviors, including abiding by rules, which will ensure community safety and foster therapeutic treatment alliances. *Id.*

In any event, as pointed out by Defendants, "[t]he Second Circuit . . . has rejected the claim that a due process right exists for a specific type of treatment." *Groves v. New York*, No. 09-CV-0412 (GLS/DEP), 2010 WL 1257858, at *10 (N.D.N.Y. Mar. 1, 2010) (citing *Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996)), *report-recommendation adopted by* 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010). Indeed, the Second Circuit has stated that "[w]e do not find

---

[27] Defendant Forshee states: "Exhibitionism is a paraphilic disorder which involves exposing one's genitals to a non-consenting/unsuspecting person. One of the risk factors for this disorder is antisocial personality disorder (a diagnosis that Plaintiff has). Treatment designed to provide individuals with tools to control their impulses and find more acceptable ways of coping with their urges than showing their genitalia to other may be an effective strategy. Cognitive behavioral therapy may help individuals, such as Plaintiff, in identifying his triggers which causes his urges and then offer him healthier ways to manage those urges. Other psychotherapy approaches include relaxation training, empathy training, coping skills training as well as identifying and alerting the thoughts that lead to exhibitionism. People with this condition do not often seek treatment on their own and do not generally recognize that they have a problem until they have ended up in court and are then required to enter treatment. (Dkt. No. 199-3 at ¶ 79.)

a due process right to a specific type of treatment or training beyond that geared toward safeguarding basic liberty interests." *Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1250 (2d Cir. 1984).

Lastly, Defendants submit that Plaintiff's claim that he is not receiving "meaningful" treatment at CNYPC SOTP originates from the New York State statutory mandate that treatment facilities "should offer meaningful forms of treatment to sex offenders in all criminal and civil phases, including during incarceration, civil commitment, and outpatient supervision."  (Dkt. No. 199-2 at 24 (citing N.Y. Mental Hyg. Law § 10.01(f).)  To the extent Plaintiff argues Defendants violated New York State law by failing to provide "meaningful" treatment, such a claim fails because "[a] violation of state law neither gives plaintiffs a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Doe v. Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) (quotations marks and alterations omitted); *see also Cimino v. Glaze*, 490 F. App'x 401, 403 (2d Cir. 2013); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983[.]") (citation omitted); *see also Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) ("An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'") (alteration in original) (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)).

In light on the foregoing and on this record, Defendants have submitted evidence that Plaintiff has been offered mental health treatment during his confinement at CNYPC SOTP,

based on professional judgment made by appropriate professionals.[28]  The record is devoid of any evidence that the treatment program is such a gross departure from accepted standards, that an inference can be drawn that professional judgment was not exercised.  Further, at this stage in the litigation, Plaintiff's passing references to other lawsuits in the consolidated complaint fails to raise a material issue of fact in this present action.

Accordingly, the Court recommends granting summary judgment to Defendants Sawyer, Maxymillian, Gonzalez, Forshee, Solovieva, Golovko, DeBroize, Bill, Cebula, Dawes, Gray, Velte, Tedesco, Coveleski, Dawes, Farnum, Hermann, LaRock, Larkin, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Hall, Kunkle, McCulloch, and Sullivan and also recommends dismissal of the claim against Defendant Bahl under 42 U.S.C. § 1915(e).

G.    **Plaintiff's Access to the Courts in Brooks I**

Plaintiff alleges he was denied access to the courts by Defendants Hogan, Miraglia, Bosco, and Nowicki and has suffered various injuries, including the inability to successfully pursue a writ of habeas corpus, a § 440.10/440.20 motion, and an Article 78 proceeding.  (Dkt. No. 159 at 71-72.)  Defendants move for summary judgment on this claim, arguing (1) any claims based on lawsuits that were filed and/or adjudicated more than three years before the commencement of Brooks I are time-barred; (2) Plaintiff fails to allege these Defendants acted

---

[28]  The Court's findings are limited to the circumstances of Plaintiff Brooks in the case at bar. The Court is cognizant of other actions in this District involving civilly confined individuals, represented by *pro bono* counsel, also challenging the adequacy of the sex offender treatment at CNYPC SOTP, which remain pending at this time.  *See, e.g.*, *Gerena v. Sullivan*, No. 9:15-CV-0489 (TJM/TWD), (N.D.N.Y.); *Rosado v. Maxymillian*, No. 9:13-CV-00359 (TJM/TWD), (N.D.N.Y.).  The Court notes that Plaintiff was similarly appointed *pro bono* counsel by this Court on February 16, 2017, but less than two months later he moved to have *pro bono* counsel relieved asserting "irreconcilable differences," which was subsequently granted.  (Dkt. Nos. 61, 79, 92, 102, 108.)

deliberately and/or maliciously; and (3) Plaintiff has failed to demonstrate an actual injury.  (Dkt. No. 199-2 at 32-38.)

###### 1.    Legal Standard

In *Bounds v. Smith*, 430 U.S. 817, 821-23 (1977), the Supreme Court held prisoners have a constitutional right of access to the courts under the Fourteenth Amendment.  *See Morello v. James*, 810 F.2d 344, 346-47 (2d Cir. 1987).  The analysis for a denial of access to the courts claim is the same for both civilly committed individuals and prisoners.  *See Lane v. Carpinello*, No. 9:07-CV-751 (GLS/DEP), 2009 WL 3074344, at *24 n.26 (N.D.N.Y. Sept. 24, 2009); *Aiello*, 2020 WL 918989, at *8 (same); *see also McChesney*, 2010 WL 3602660, at *12 ("Undeniably[,] the civilly committed patients [at CNYPC], like convicted inmates, enjoy a First Amendment right of meaningful access to the courts." (citation omitted)).

"[T]o state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury."  *Vega v. Artus*, 610 F. Supp. 2d 185, 201 (N.D.N.Y. 2009) (citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).  "Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure a reasonably adequate opportunity [to access the courts], prisoners must demonstrate 'actual injury' in order to have standing."  *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) (quoting *Lewis*, 518 U.S. at 351) (internal quotations omitted).  "A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts."  *Amaker v. Haponik*, No. 98 Civ. 2663, 1999 W L 76798, at *3 (S.D.N.Y. Feb.17, 1999).  Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim.  *Lewis*, 518 U.S. at 349, 351-

53.  "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

"To establish an 'actual injury,' plaintiff must show that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim.  To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the court to determine whether the claim had an arguable basis in either law or fact."  *Zeigler v. New York*, 948 F. Supp. 2d 271, 294 (N.D.N.Y. 2013) (citations and quotations omitted).  The fact that an individual may not be able to litigate effectively once his claim is brought before the court is insufficient to demonstrate actual injury.  *See Lewis*, 518 U.S. at 354.  Rather, the plaintiff must show that he was unable to file the initial complaint or petition, or that the complaint he filed was so technically deficient that it was dismissed without a consideration of the merits of the claim.  *See id.* at 351.

## 2.  Analysis

Generally, Plaintiff claims that, as a *pro se* litigant, he "remains at a huge disadvantage, without the finances, and without the unavailability [sic] of law books and a law library."  (Dkt. No. 159 at 71.)  Specifically, Plaintiff alleges "[f]urther litigation could not be taken due to the unavailability of law books, and a law library, or counsel" in the following actions: (1) state writ of habeas corpus identified under Index No. CA2011-001873 (RJI No. 32-11-0646), (2) Section 440.10/440.20 motion identified under Indictment Nos. 6985/1997 and 3757/1998, (3) Article 78

action identified under Index No. CA2011-001154 (RJI No. 32-11-0530), and (4) federal writ of

habeas corpus identified as *Brooks v. Sawyer*, No. 9:11-CV-248 (NAM). *Id.* at 71-72.[29]

As an initial matter, the Court finds Plaintiff's access to the court claims based on the

Article 78 and state writ of habeas corpus actions are untimely. (*See* Part III.A., *supra*.) (Dkt.

No. 199-2 at 34-35.) The record demonstrates Plaintiff filed his Article 78 petition on July 6,

2011, and the Supreme Court, Oneida County denied it on January 18, 2012. (Dkt. No. 196-44.)

Similarly, Plaintiff filed a motion for poor person status to commence a habeas corpus

proceeding on August 8, 2011, which was subsequently denied on August 26, 2011, "because

[Plaintiff] has failed to show he has a meritorious claim[.]" (Dkt. No. 196-42.) Here, because

Plaintiff was aware of the facts constituting the basis of these access to court claims as of

January 18, 2012, and August 26, 2011, respectively, and more than three years prior to the

commencement of Brooks I, said claims are barred by the statute of limitations. *See Peterec v.*

*Hilliard*, No. 12-CV-3944 (CS), 2013 WL 5178328, at *7 (S.D.N.Y. Sept. 16, 2013).

Turning to the merits, the Court finds Plaintiff's allegation that he has been denied access

to the courts is conclusory and speculative. On the present record, Plaintiff has failed to establish

the existence of a genuine issue of material fact or to even plead a constitutional claim with

respect to his right of access to the courts.[30] Indeed, other than stating "[f]urther litigation could

not be taken due to the unavailability of law books, and a law library, or counsel" he does not

---

[29] Certified copies of the pleadings and decisions in the state court actions are attached as
Exhibits "G," "H," and "I" to the Attorney Declaration. (Dkt. Nos. 196-42, 196-43, 196-44.)
The Court takes judicial notice of the same, along with Plaintiff's application for habeas relief in
*Brooks v. Sawyer*, No. 9:11-CV-248.

[30] Again, the Court's findings are limited to the circumstances of Plaintiff Brooks in the case at
bar. The Court notes that in both *Rosado v. Maxymillian*, *supra*, and *Gerena v. Sullivan*, *supra*,
in addition to *Peters v. Sullivan*, No. 9:15-CV-01327 (TJM/TWD) (N.D.N.Y.), civilly confined
individuals, represented by *pro bono* counsel, assert First Amendment access to courts claims at
CNYPC SOTP, which remain pending at this time.

assert any facts showing how his pursuit of any of the identified litigation was affected by the alleged unavailability of law books, law library, or counsel. *See Johnson v. Yelich*, No. 9:11-CV-01207 (JKS), 2013 WL 5592735, at *18 (N.D.N.Y. Oct. 10, 2013) ("[T]he mere limitation of access to legal materials, without more, does not state a constitutional claim."). Nor does Plaintiff explain how the lack of legal resources "prejudiced his ability to seek redress from the judicial system." *Smith v. O'Connor*, 901 F. Supp. 644, 649 (S.D.N.Y. 1995).

Moreover, Plaintiff has failed to demonstrate he suffered an actual injury. Here, Plaintiff's vague and conclusory assertions that "[f]urther litigation could not be taken" do not allow for any determination as to whether such "further litigation" would have been non-frivolous. *See Green v. Fischer*, No. 6:11-CV-6063 (EAW), 2015 WL 9460145, at *4 (W.D.N.Y. Dec. 23, 2015) (finding the plaintiff failed to state a denial of access to courts claim because he "has failed to provide any detail regarding the appeal he allegedly was prevented from making, and the Court is therefore unable to conclude that it was non-frivolous"); *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261-62 (N.D.N.Y. 2003) ("Plaintiff's statement that he has been denied access to the courts is wholly conclusory. Although he does identify a pending appeal, he does not identify particular legal documents; show how the allegedly missing documents related to his appeal or new trial; [or] assert any facts showing that his pursuit of any litigation identified by him was in any way affected by his lack of access to any particular documents.").

Further, review of the court documents in the proceedings underlying Plaintiff's access to court claim indicates those actions were, in fact, meritless.[31] *Cf. Suggs v. Maxymillian*, No. 9:13-

---

[31] Plaintiff's underlying state claims seemingly stem from Plaintiff's contention that he has been improperly confined at CNYPC under the MHL. In denying Plaintiff's motion for poor person status to commence a habeas corpus proceeding, the court found Plaintiff was properly confined

CV-359 (NAM/TWD), 2015 WL 5750998, at *11-12 (N.D.N.Y. Sept. 30, 2015) (denying summary judgment where plaintiffs raised triable issues of fact as to the actual injury element where plaintiffs were unable to file a complaint about non-frivolous claims because of the lack of a law library).  Here, Plaintiff was able to commence the specific actions that purportedly serve as the basis for his access to courts claims, as well as receive a decision disposing of each one of those actions on the merits.  *See Lewis*, 518 U.S. at 360 n.7 ("Courts have no power to presume and remediate harm that has not been established."); *Arce v. Walker*, 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999) ("[S]ome showing of impaired access is required.  . . .  A prisoner's conclusory assertion that he suffered prejudice does not suffice to support an access to court claim.").

Additionally, Plaintiff's claim for denial of access to the courts fails as a matter of law because he has not alleged Defendants Hogan, Miraglia, Bosco, and Nowicki deliberately and maliciously impeded his access to the courts.  *See DeMeo v. Tucker*, 509 F. App'x 16, 18 (2d Cir. 2013) ("To succeed on a denial of access claim, a plaintiff must show that the defendants . . . engaged in deliberate and malicious conduct.").  To the extent Plaintiff bases his access to courts claim against these named Defendants solely by virtue of their supervisory positions, as set forth

---

under the MHL and that Plaintiff "has not shown on his submitted papers that he has a meritorious claim."  (Dkt. No. 196-42 at 7-10.)  After considering the facts of Plaintiff's Article 78 petition, the court found Plaintiff failed "to meet the Article 78 standards."  (Dkt. No. 196-44 at 1-5.)  Plaintiff's motion to set aside his civil judgment and sentence pursuant to CPL § 440.10 and § 440.20 was denied because the court could not set aside a civil judgment under a criminal statute.  (Dkt. No. 196-43 at 1-3.)  On May 29, 2012, the District Court denied Plaintiff's application for habeas relief.  *Brooks v. Sawyer*, No. 9:11-CV-248 (NAM), Dkt. No. 46. Although the District Court based this decision on Plaintiff's failure to exhaust his claims, leading to dismissal based upon procedural default, the Court specifically stated that all of Plaintiff's claims were also "substantively without merit."  *Id*. at 18-19 n.13.  As noted by Defendants, Plaintiff appealed that decision; that appeal was dismissed by the Second Circuit. *Id*. at Dkt. No. 56.

above, there is no *respondeat superior* liability under Section 1983.  *See Richardson*, 347 F.3d at

435; *Wright*, 21 F.3d at 501.

Lastly, as noted by Defendants, Plaintiff's allegations that he has been denied access to

courts is "spurious in light of his lengthy and voluminous filings in this action as well as other

federal and state court actions he has commenced."  (Dkt. No. 199-2 at 37-38.[32])  *See Davidson*

*v. Murray*, 371 F. Supp. 2d 361, 366-67 (W.D.N.Y. 2005) (holding "no reasonable juror could

find that prison officials hindered plaintiff's efforts to pursue his legal claims during his

incarceration" where plaintiff had filed "no fewer than six federal civil rights actions" in United

States District Court, "at least sixteen separate appeals in the Second Circuit . . . [and] no fewer

than eighteen separate lawsuits in New York State courts"); *Ceparano v. Southampton Justice*

*Court*, No. 09-CV-423 (SJF/AKT), 2010 WL 11527157, at *16 (E.D.N.Y. Mar. 22, 2010) ("In

light of multiple motions and opposition briefs Plaintiff has filed in this action, all of which

contain extensive citation to case law, there is no basis to find that his legal claims were

prejudiced due to his purportedly limited access to the library."), *aff'd*, 404 F. App'x 537 (2d Cir.

2011).

---

[32] Specifically, the Court takes judicial notice of the following five federal actions commenced by Plaintiff in and around the time periods alleged in Brooks I: (1) *Brooks v. Hogan, et al.*, No. 9:14-CV-0477 (LEK/DJS) (N.D.N.Y.) (complaint filed on 4/25/14; jury verdict entered on 2/6/20; appeal filed 2/20/20); (2) *Brooks v. Spitzer*, No. 9:13-CV-1483 (GLS/ATB) (N.D.N.Y.) (complaint filed on 12/2/13; complaint dismissed on 3/31/16; appeal denied on 9/27/16); (3) *Brooks v. Sawyer*, No. 9:11-CV-0248 (NAM) (N.D.N.Y.) (Petition for Writ of Habeas Corpus filed on 3/7/11; petition denied and dismissed on 5/29/12; appeal dismissed on 9/17/14); (4) *Brooks v. State of New York*, No. 9:09-CV-0743 (GLS/RFT) (N.D.N.Y.) (complaint filed on 6/29/09; complaint dismissed on 3/28/13); and (5) *Brooks v. Pataki, et al.*, No. 1:08-CV-08563 (JSR) (S.D.N.Y.) (complaint filed on 1/10/08; jury verdict entered on 3/31/16; multiple appeals filed).

Accordingly, and for the reasons stated above, the Court recommends granting summary judgment to Defendants Hogan, Miraglia, Bosco, and Nowicki on Plaintiff's access to courts claims in Brooks I.

### H.     Plaintiff's Clothing Claim in Brooks II

Plaintiff alleges he was denied adequate clothing by Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxton, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan.  (Dkt. No. 159 at 78.)  Defendants argue Plaintiff's clothing claims based on events that allegedly occurred before May 25, 2015, are time barred and the remaining claims fail on the merits. (Dkt. No. 199-2 at 29-32.)  The Court agrees with Defendants.

### 1.     Legal Standard

As discussed above, individuals involuntarily committed to state custody have constitutionally protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety.  *Youngberg*, 457 U.S. at 324.  Challenges to CNYPC policies and practices have previously been analyzed under the Due Process Clause of the Fourteenth Amendment.  *See, e.g.*, *McChesney*, 2010 WL 3602660, at *9.  Under *Youngberg*, CNYPC residents have "constitutionally protected interests in . . . reasonably non-restrictive confinement conditions."  457 U.S. at 324.  The court should "accord[] 'a presumption of correctness' to the decisions of 'appropriate professional[s].'"  *Buthy v. Comm'r of the Office of Mental Health of N.Y.*, 818 F.2d 1046, 1050 (2d Cir. 1987) (quoting *Youngberg*, 457 U.S. at 324).

In evaluating whether CNYPC policies violate a resident's constitutional rights, a court must "balance 'the individual's interest in liberty against the State's asserted reasons for

restraining individual liberty.'"  *McChesney*, 2010 WL 3602660, at *10 (quoting *Buthy*, 818 F.2d

at 1050).  "[S]ome incidental restrictions relating to everyday life are necessary in the context of

the organized caretaking of institutional residents."  *Id.*

### 2.    Analysis

As an initial matter, the Court finds Plaintiff's claims concerning his clothing that

allegedly occurred before May 25, 2014, three years prior to commencement of Brooks II, are

time-barred.  (*See* Part III.A., *supra*.)  Turning to the merits, while Plaintiff claims he was denied

adequate clothing, the crux of Plaintiff's claim challenges CNYPC's policy of requiring residents

to purchase new clothing instead of providing free clothing.  (Dkt. No. 159 at 78; *see also*

Brooks II, Dkt. No. 29-1.)

Undeniably, "CNYPC residents have a constitutional right to adequate food, shelter,

clothing and medical care."  McChesney, 2010 WL 3602660, at *11 (brackets and citations

omitted).  However, "[n]either the constitution nor state law . . . requires that CNYPC inmates be

given a clothing allowance or be permitted to purchase clothing of their choice."  Id. (citing N.Y.

Mental Hyg. Law § 33.02(a)(3)).  As noted, Plaintiff states he was provided with clothing upon

his arrival at CNYPC and following surgery in 2010.  (Dkt. No. 159 at 78.)  Plaintiff alleges he

has otherwise been required to purchase new clothing and he has not been able to "exchange" his

old clothing for new clothing.  (Brooks II, Dkt. No. 1-29 at 6-7.)  Plaintiff contends his monthly

allowance is insufficient to purchase clothing along with his other expenses such as telephone

calls, postage, stationary, and typewriter ribbons.  *Id.*

According to Defendant Nowicki, Chief of Mental Health Treatment Services for

CNYPC SOTP, residents are provided with "State-issued clothing (3 count clothing pack)"

pursuant to CNYPC SOTP Policy 5.33.  (Dkt. No. 196-35 at ¶¶ 1, 21.[33])  After receiving the State issued clothing, it is the responsibility of residents to purchase any additional clothing using their own funds unless they are determined to be indigent.  *Id*. at ¶ 22.  The purpose of the clothing policy is to teach CNYPC residents how to budget their finances to meet their needs for when they transition to the community.  *Id*. at ¶ 30.  Residents are provided with work opportunities within the facility and are paid minimum wage for their labor.  *Id*.  Defendant Nowicki explains residents are expected to manage their finances, which includes budgeting for personal clothing.  *Id*.  If a resident is unable to work and has no other source of income, he is provided with a personal needs allowance in the amount of $35.00 per month.  *Id*. at ¶ 31.

In those instances where a resident is determined to be indigent, he or she is eligible for a clothing exchange as outlined by CNYPC's Environmental Services Policy ES-7.1.  *Id*. at ¶ 24.  Pursuant to CNYPC policy, residents are "indigent" if they:

> do not receive PNA (Personal Needs Allowance), have no other source of income or funds (i.e., pensions, personal savings, family or other social support . . .), are determined to be unable to *[due to reasons other than choosing not to]* participate in vocational programs . . . and/or have not accumulated funds in excess of $50 during a 30-day period.

(Dkt. No. 196-39 (emphasis in original).)

Despite Plaintiff's allegations, CNYPC SOTP has no record of Plaintiff corresponding with staff about new clothing or the clothing exchange.  (Brooks II, Dkt. No. 1-29; Dkt. No. 196-35 at ¶¶ 19, 32.)  Even assuming Plaintiff's letters requesting new clothing on February 19, 2016, May 13, 2016, and February 22, 2017, were received by CNYPC SOTP, Defendants have submitted evidence in support of their motion demonstrating Plaintiff did not qualify as indigent

---

[33]  As noted, Plaintiff states he received clothing upon his arrival at CNYPC and again in 2010 following surgery.  (*See* Brooks II, Dkt. No. 1-29 at 2.)

under CNYPC policy and would not have been eligible to participate in the clothing exchange program. (*See* Dkt. No. 196-39; *see also* Brooks II, Dkt. No. 1-29.) Indeed, at the time of Plaintiff's alleged requests, Plaintiff had not experienced a thirty-day period in which his funds were less than $50. (Dkt. No. 196-40 at 5-7.) In fact, on February 22, 2017, his personal account contained over $100. *Id.*

In sum, the record demonstrates CNYPC's clothing policy is for legitimate reasons based on professional judgment. There is no indication that Defendants departed substantially from accepted professional judgment, practice, or standards.[34] Therefore, the Court recommends granting summary judgment to Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxton, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan.

## I.    Plaintiff's Retaliation Claim in Brooks II

Plaintiff claims Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan retaliated against him for filing grievances and complaints. (Dot. No. 159 at 79, 99-125.) Defendants argue they are entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff cannot

---

[34] The Court reaches the same conclusion under the Fourteenth Amendment deliberate indifference analysis. Plaintiff's allegations do not satisfy the objective prong as he does not claim that he was without *any* clothing, only that he was required to purchase socks, underwear, and t-shirts to replace his worn undergarments. *See McChesney*, 2010 WL 3602660, at *11; *Gssime v. Watson*, No. 09-CV-5581(JS)(ETB), 2012 WL 540926, at *4 (E.D.N.Y. Feb. 16, 2012) ("As to the underwear, socks, and toothpaste, [the plaintiff] does not claim he was denied these items altogether; rather, he claims he was wrongfully charged for them. This does not rise to the level of [a constitutional] violation."). Further, on this record, the Court finds Plaintiff has failed to show Defendants acted recklessly or intentionally in requiring him to pay for new clothing when he did not qualify for the clothing exchange.

establish any causal connection between his protected conduct and any alleged adverse action. (Dkt. No. 199-2 at 38-42.)

###    1.    Legal Standard

Retaliation claims find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  Central to such claims is the notion that state officials may not take actions that would have a chilling effect upon an individual's exercise of First Amendment rights.  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  However, as the Second Circuit has repeatedly cautioned, such claims are easily incanted and prone to abuse.  *Id.*  Courts must therefore approach retaliation claims with "skepticism and particular care."  *Id.*  Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not enough. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Sienkiewicz*, 534 U.S. 506; *see also Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (N.D.N.Y. Mar. 31, 2009) ("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as the evidence tending to link the two.  When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

To establish a *prima facie* First Amendment retaliation claim, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and

the adverse action." *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).  As to the first

element, it is well-settled the filing of grievances and lawsuits is a constitutionally protected

activity under the First and Fourteenth Amendments.  *Graham v. Henderson*, 89 F.3d 75, 80 (2d

Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988)); *see also Aiello*, 2020 WL

918989, at *15 n.15 (applying "legal theories from prison cases to claims implicating the First

Amendment brought by civilly committed individuals").

      "Adverse action" for purposes of a retaliation claim has been defined as "retaliatory

conduct that would deter a similarly situated individual of ordinary firmness from exercising . . .

constitutional rights . . . .  Otherwise the retaliatory act is simply *de minimis* and therefore

outside the ambit of constitutional protection."  *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.

2003) (citing *Dawes*, 239 F.3d at 493).  This is an objective test, so an adverse action may be

found even if the plaintiff himself was not subjectively deterred from exercising his rights.  *Gill*,

389 F.3d at 381.

      A plaintiff bears the burden of showing "the protected conduct was a substantial or

motivating factor" in the defendant's decision to act against the plaintiff.  *Graham*, 89 F.3d at 79.

For protected conduct to be a substantial or motivating factor in a decision, it is "only intuitive"

that "the decisionmakers must be aware of the protected conduct."  *Wrobel v. County of Erie*,

692 F.3d 22, 32 (2d Cir. 2012) (citation omitted).  In evaluating whether a causal connection

exists between the plaintiff's protected activity and a state official's actions, "a number of factors

may be considered, including: (i) the temporal proximity between the protected activity and the

alleged retaliatory act; (ii) the [plaintiff's] prior good disciplinary record; (iii) vindication at a

hearing on the matter; and (iv) statements by the defendant concerning his motivation."

*Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872-73).

"The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*  A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even where a plaintiff establishes prima facie claim of retaliation, defendants may avoid liability if they demonstrate they would have taken the adverse action "even in the absence of the protected conduct." *Aiello*, 2020 WL 918989, at \*14 (citing *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)).  If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham*, 89 F.3d at 79 (citations omitted).

### 2.    Analysis

Here, there is no genuine dispute in this case that the conduct at issue—filing grievances and lawsuits—constitutes constitutionally protected activity.  (Dkt. No. 199-2 at 38-43.)  *See Graham*, 89 F.3d at 80 ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.").  However, the record before the Court does not support Plaintiff's claims of retaliatory adverse action by Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan.

In Brooks II, Plaintiff claims, albeit in conclusory fashion, the alleged "harmful" and "punitive" conditions he is experiencing at CNYPC, including loss of privileges and being placed on MOD status, is retaliation for the administrative complaints and litigation he has filed.

(*See generally* Dkt. No. 159 at 79, 99-125.)  To be sure, Plaintiff has expressed overall

discontent with his civil confinement at CNYPC, including, *inter alia*, the treatment, conditions,

policies, and procedures, by filing numerous administrative grievances and civil actions.

However, as discussed above, the Court has determined the alleged conditions about which

Plaintiff's complains, including his placement on MOD status, loss of privileges, and direction to

complete BCAs, were for legitimate reasons based on professional judgment.  (*See* Part III.E,

*supra*.)  As noted, there is ample record support that Plaintiff's alleged restrictive and punitive

confinement resulted from Plaintiff's treatment interfering behaviors, including, but not limited

to, physical and verbal confrontations with staff and residents, aggressive and threatening

behavior, failure to comply with staff direction and instruction, and failing to adhere to facility

rules.  *See generally id*.  Conversely, there is no evidence in the record, other than Plaintiff's

conclusory and speculative allegations, suggesting the alleged adverse actions were motivated by

a desire to retaliate against Plaintiff because of his written grievances and complaints, including

Brooks I.  In short, Plaintiff offers no evidence to corroborate his claim that Defendants acted

with a retaliatory intent.

As to the causal connection, Plaintiff must show that his protected speech was "a

substantial motivating factor" in Defendants' decision to impose the adverse action.  *Washington*

*v. County of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (citation omitted). "To do so, [Plaintiff]

must aver some 'tangible proof' demonstrating that [his] protected speech" animated the

decision.  [He] may not rely on conclusory assertions of retaliatory motive." *Id.*  Here, other

than the alleged temporal proximity between the protected activity and the alleged retaliatory

acts, the Court finds the summary judgment record lacks such tangible proof to establish a causal

connection.[35]  The record lacks non-conclusory evidence of Plaintiff's prior good disciplinary

record, vindication at a hearing on the matter, or any statements by Defendants concerning

motivation.

Even assuming Plaintiff could establish the requisite causal connection between his

protected conduct and the alleged adverse action, the record evidence demonstrates the same

actions, often loss of privileges and/or placement on MOD status, would have been taken even in

the absence of the protected conduct.  (Dkt. No. 199-3 at ¶¶ 54-69.)  *See, e.g.*, *Yeldon*, 2010 WL

983819, at *10 ("Moreover, to the extent Plaintiff asserts that his transfer to the MOD unit

constituted an adverse action against him, the record is clear that he was transferred because he

was involved in a physical altercation with another resident, not as a reprisal for his engagement

---

[35]  Defendants contend many of the alleged adverse actions predated the related grievance at
issue and, therefore, the alleged action in question could not have been in retaliation for
Plaintiff's subsequent administrative complaints and/or appeals.  (Dkt. No. 199-2 at 39-41.)  *See*
*Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 24 (2d Cir. 2017) (summary order)
("With respect to the 'causal connection' requirement, a plaintiff must plead facts from which it
can reasonably be inferred that the defendant was aware of the purportedly protected speech.");
*Faulk v. Fisher*, 545 F. App'x 56, 59 (2d Cir. 2013) (summary order) (finding plaintiff failed to
produce evidence suggesting that the defendants were "motivated by, or even aware of," his
grievance); *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *12
(N.D.N.Y. Mar. 24, 2015) ("Obviously, there could be no causal connection between plaintiff's
[protected activity] and the misbehavior report if the defendants were not aware of the [protected
activity] when they initiated disciplinary charges.").  For example, Defendants point out that
Plaintiff alleges he filed an administrative complaint on December 28, 2016, regarding an
incident with another CNYPC resident that occurred on May 10, 2015.  (Dkt. No. 159 at 98.)
Plaintiff further claims the filing of the complaint "led to plaintiff's restraint and seclusion on the
MOD Unit-504 . . . from the date of 5.11.2015 until 5.15.2015."  *Id.*  Defendants thus contend
Plaintiff could not have been retaliated against in May of 2015 as a result of an administrative
complaint he filed approximately one-and-a-half years later in December 2016.  (Dkt. No. 199-2
at 40.)  While the Court agrees, Plaintiff also complains generally of retaliation for his filing
grievances and lawsuits, including the Brooks I litigation, which was filed in January 2015.
(Dkt. No. 159 at 79, 118.)  Thus, construed liberally, any of the alleged adverse actions described
by Plaintiff in Brooks II seemingly could have been in retaliation for Plaintiff's many complaints
or litigation, which began at least as early as January 2015 and, therefore, precede the alleged
adverse acts in Brooks II.

in constitutionally protected activity."). Thus, on this summary judgment record, the Court also finds Defendants have provided a non-retaliatory basis for imposing the complained of actions.

Accordingly, the Court recommends granting summary judgment to Defendants Bill, Cebula, Coveleski, Dawes, DeBroize, Farnum, Forshee, Golovko, Gray, Hermann, LaRock, Larkin, Maxymillian, Mayer, Mills, Nowicki, Patterson, Saxson, Sokernyk, Solovieva, Tedesco, Hall, Kunkle, McCulloch, and Sullivan on Plaintiff's retaliation claims in Brooks II.

### J.    Defendants' Remaining Contentions

As noted, Defendants also argue Plaintiff has failed to sufficiently allege the personal involvement of several Defendants, including but not limited to current and former supervisory officials. (Dkt. No. 199-2 at 43-45.[36]) Defendants further submit they are entitled to qualified immunity. *Id.* at 45-46. However, because of the above recommendation recommending dismissal of the consolidated complaint in its entirety, the Court need not address Defendants' remaining arguments.

## IV.    CONCLUSION

After review of the extensive record, and for the reasons stated herein, the Court recommends that Defendants' motion for summary judgment be granted and that the consolidated complaint be dismissed in its entirety with prejudice.

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 196) be **GRANTED**; and it is further

---

[36] Specifically, Defendants note Hogan retired on October 21, 2012, Miraglia retired on July 29, 2011, Sawyer retired June 30, 2011, and Bahl resigned on July 6, 2012. (Dkt. Nos. 196-4 at ¶¶ 5,17; 196-5 at ¶¶ 4, 5.)

**RECOMMENDED** that Plaintiff's consolidated complaint (Dkt. No. 159) be dismissed in its entirety with prejudice; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[37]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  April 20, 2020
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[37]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).